William J. Wineberg and Estate of Janet R. Wineberg, deceased, William J. Wineberg, Executor v. Commissioner.
Wineberg v. Commissioner
Docket No. 78525.
United States Tax Court
T.C. Memo 1961-336; 1961 Tax Ct. Memo LEXIS 16; 20 T.C.M. (CCH) 1715; T.C.M. (RIA) 61336; December 14, 1961
Carl E. Davidson, Esq., American Bank Bldg., Portland, Ore., Charles P. Duffy, Esq., and Stewart M. Whipple, Esq., for the petitioners. Leo K. O'Brien, Esq., and John D. Picco, Esq., for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioners' income tax and additions to the tax as follows: Additions to
Tax under
Deficiency in
Sec. 294(d),
Year
Income Tax
I.R.C. 1939
1950
$ 18,902.06
1951
17,285.07
1952
63,456.08
$16,366.91
1953
20,493.43
3,466.39
Total
$120,136.64
$19,833.30
*18 By amended answer respondent claimed increased deficiencies and additions to tax under sections 293(b) and 294(d)(1)(A) of the Internal Revenue Code of 1939 as follows: Deficiency in
Sec. 293(b)
Sec. 294(d)(1)(A)
Year
Income Tax
I.R.C. 1939
I.R.C. 1939
1950
$ 2,843.50
$ 10,872.78
1951
44,202.72
30,743.89
1952
25,514.05
44,485.06
($3,170.50)
1953
22,133.06
21,313.24
1,866.06
Total
$94,693.33
$107,414.97
($1,304.44)
The issues for decision are as follows: 1. Whether respondent erred in his determination (a) in treating the amounts received by petitioners from certain sales of timber during the years 1950 through 1953 as ordinary income instead of capital gains as reported by the petitioners, and (b) in treating certain transactions entered into by petitioners during the years 1950 through 1953 as resulting in taxable gain in excess of that reported by petitioners who had treated the transactions partially as exchanges of like properties. 2. Whether certain of these sales, the gain from which respondent determined to constitute ordinary income, should have been treated as gain from the sale of capital assets by reason of being dispositions *19 of timber with the retention by the seller of an economic interest therein. 3. Whether petitioners erroneously reported as ordinary income from production royalties the amounts of $9,008.15, $15,314.76, and $17,774.55 received in the years 1951, 1952, and 1953, respectively, from Cascadia Lumber Company and Yaquina Bay Mills, Inc., under contracts providing for payments to petitioner by each of those mills. 4. Whether certain sales made by petitioners in 1952 and 1953 were deferred payment sales taxable in the year in which the sale was made as determined by respondent, or installment sales as reported by petitioner. 5. Whether an amount received by petitioners in 1950 for use of a logging road constituted ordinary income as determined by respondent, or capital gain as reported by petitioners. 6. Whether petitioners' income should be increased over the amount shown by respondent in the notice of deficiency as affirmatively alleged by respondent in his amended answer: (a) By the amount of $38,177.50 resulting from treating petitioners' gain on the sale in 1951 of stock of Yaquina Bay Mills, Inc., as being in part a short-term capital gain instead of entirely a long-term capital *20 gain as reported by petitioners on their income tax return. (b) By the amount of $5,000 paid by petitioners to the Sacred Heart Church in 1953 which respondent alleged constituted a payment for timber and timberland and not a charitable contribution as claimed by petitioners on their income tax return for 1953. (c) By the amounts of $5,039.91, $1,450, $7,333.03, and $1,060.31 in the years 1950, 1951, 1952, and 1953, respectively, which respondent alleged was petitioners' share of the profits from log sales of a joint venture between petitioner and W. S. Hilberg. (d) By the amounts of $19,231.61, $23,267.61, and $18,615.73 for the years 1951, 1952, and 1953, respectively, which respondent alleged petitioners received from the sale of timber, logs, and lumber to Yaquina Bay Mills, Inc., but did not report on their income tax returns. (c) By the amount of $7,000 for the year 1951 which respondent alleged represented unreported sales of timber to George E. Miller Lumber Co. and the amounts of $7,000 representing alleged unreported sales of timber to Pritzlaff and Wilson and $2,000 representing alleged unreported sales of timber to Giel & Van Handel Lumber Company in the year 1953. *21 7. Whether any part of the deficiencies as determined by respondent or increased deficiencies as claimed in his amended answer is due to fraud on the part of petitioners with intent to evade the payment of tax. Each party has conceded certain other issues raised in the pleadings. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners are husband and wife residing in Vancouver, Washington. They filed joint Federal income tax returns for each of the years 1950 through 1953 with the district director of internal revenue for the district of Washington at Tacoma, Washington. Issue 1. Whether Profits from Certain Sales and Exchanges Were Ordinary Income a. Profit from Timber Sales About 1926, William J. Wineberg, hereinafter referred to as petitioner, began to purchase and sell real estate for his own account and has purchased and sold real estate since that time. In the late 1920's, petitioner commenced acquiring timberlands. He has continued to acquire such timberlands from that time throughout the taxable years here involved. Petitioner acquired many of his timberlands at tax delinquent sales from the time he began acquiring such *22 lands throughout the years here involved. About 1940 petitioner began to sell some of his timber and has continued to sell timber throughout the taxable years here involved. From the early 1940's throughout the years here involved, it has been petitioner's policy to purchase the timberland, sell the timber thereon, and retain the land. In 1950 petitioner owned between 50,000 and 100,000 acres of timberland located in the States of Oregon, California, and Washington and in Canada. In 1952 he owned approximately 35,000 acres of timberland in Lincoln County, Oregon. These Lincoln County timberlands contained approximately 250,000,000 feet of timber. During the years 1948 through 1957 petitioner made at least 107 separate sales of timber and some sales of land. [1] The timber and timberlands sold by petitioner during this 10-year period were located in 20 different counties in 3 different States, and the sales prices were in the aggregate amount by years as follows: Year
Amount
1948
$ 74,195.23
1949
80,712.69
1950
109,497.94
1951
171,716.09
1952
299,718.97
1953
286,077.85
1954
317,483.42
1955
452,430.08
1956
263,931.23
1957
358,372.41
$2,414,135.91
*23 Petitioner was listed in the alphabetical and classified sections of the Portland, Oregon, and Vancouver, Washington telephone directories during the years 1931 through 1947 as being engaged in the real estate business. During the taxable years here involved petitioner maintained an office in his home in Vancouver, Washington. From time to time persons interested in purchasing timber or timberlands from petitioner would come to this office to negotiate *24 for such purchase with petitioner. Abount 1950 petitioner opened an office in Newport, Oregon under the assumed name of Wineberg Timber Company. Wineberg Timber Company was a sole proprietorship of petitioner. At first the office of this company was located in the office of petitioner's accountant and later was moved to a separate location. During the period April 1, 1952, to July 1955, petitioner employed Ellis W. Moses as manager of his Newport, Oregon office operating under the name of Wineberg Timber Company. On April 6, 1953, an assumed business name certificate under the name of Wineberg Company was filed in Lincoln County, Oregon, showing the true names of the persons conducting this business to be petitioner and Ellis W. Moses. The business of the Wineberg Timber Company was stated to be, "to purchase, exchange, sell and otherwise deal in timber, timberlands, logs, lumber and other forest products, and to log and manufacture lumber and lumber products." In addition to Moses, petitioner employed in the Newport office of Wineberg Timber Company on a full-time basis, a secretary, an engineer-cruiser, James Dennison, a helper for Dennison, and an office manager. Petitioner also *25 employed a timber finder, Norman Pauley, who did not work in the Newport office, and on occasions he also employed Sherman Hendrickson. Ordinarily, petitioner's dealings with Hendrickson consisted of Hendrickson's coming to petitioner to arrange for the purchase of timber from petitioner for other persons. Moses' duties while he was employed as manager of the Wineberg Timber Company were to supervise petitioner's timber operations, be responsible for the management of the Wineberg Timber Company office, see that timber sold under contract was paid for, cut and removed pursuant to the contract, handle inquiries from prospective purchasers concerning the availability of timber for sale, and transmit offers to purchase timber to petitioner. Sales of timber negotiated by Moses were subject to approval by petitioner. Dennison's primary duties were to cruise and check petitioner's timber holdings and to check and run timber lines. Pauley's main duties were to locate and check timber tracts, acquire properties for rights-of-way and properties adjoining tracts of timberlands owned by petitioner. Petitioner's office in Newport, Oregon had a sign on the door reading, "Wineberg Timber Company. *26 " The Wineberg Timber Company was listed in the classified section of the Corvallis, Oregon and vicinity telephone directory of October 1953 under the heading of "Timber and Timberland Companies." The stationery of the Wineberg Timber Company carried its title, location, and telephone number. While Moses was employed by petitioner, his name was carried on the stationery as the general manager. Moses distributed business cards of the Wineberg Timber Company carrying his name as general manager with his business and home telephone numbers. While Moses was employed by the Wineberg Timber Company, petitioner advertised in the name of the company over the radio for the purchase of logged-over lands or timberlands but these radio advertisements did not advertise timber or timberlands for sale. Persons engaged in the timber business in Lincoln County, Oregon knew that petitioner bought and sold timber and timberlands. Petitioner did not have a set price which he had placed on specific timber, but throughout the 1940's and 1950's petitioner made sales of timber when he believed that he had a prospective purchaser for such timber at a price that he considered to be "the right price." *27 The returns filed by petitioners for each of the years 1950 through 1953 contained a schedule of income and expense. Some of the items listed under expense in each of these returns were amounts spent by petitioner in maintaining the Wineberg Timber Company office at Newport, Oregon. Petitioner, in some instances, would plant and reseed timberlands owned by him. As a part of the reseeding program he practiced pest control, having poisoned pellets dropped by plane on the reseeded timberlands. Petitioner also attempted to acquire parcels of land adjoining land that he already owned in instances where such acquisition would be advantageous to natural reseeding of his timberlands. In the years 1950 to 1953, inclusive, petitioner sold timber as follows: Year
Amount
Date Acquired
Cost to
Profit
of Sale
Purchaser
of Sale
by Petitioner
Petitioner
on Sale
1950
Stebco Lumber Co.
$26,253.25
5/31/42
$ 340.00
$25,913.25
1950
Columbia Lumber Co.
14,873.50
6/19/43
190.00
14,682.70
1950
A. J. Gross
500.00
3/29/37
186.00
314.00
1950
Maloney & Lee
2,700.00
12/ 1/41
100.00
2,600.00
Chambers
1950
A. K. Wilson
2,000.00
1942
Unknown
2,000.00
1951
Wagner Bros. Lumber
15,000.00 *
1940
72.00
12,928.00
Co.
1951
Sherman Hendrickson
9,700.00
1943-46
Unknown
9,700.00
1951
Multnomah Plywood
2,212.70
1942
Unknown
2,212.70
1951
P & W
4,541.65
1943-46
Unknown
4,541.65
1951
Weinert
4,690.00
1944
Unknown
4,690.00
1951
Landess
3,750.00
1943
Unknown
3,750.00
1952
Peninsula Plywood
1,000.00
1946
27.17
972.83
1952
Swanberg
1,100.00
1942
129.00
971.00
1952
Morris
4,650.00
1936
180.00
4,470.00
1952
Rice Bros.
2,000.00
1950
750.00
1,250.00
1953
Guy Roberts Lumber
15,938.97
Apr. 1951 &
8,500.00
7,438.97
Co.
Sept. 1952
1953
Swanberg
2,000.00
1946
Unknown
2,000.00
1953
Northern Lumber Co.
4,879.00
1944
329.18
4,549.82
*28 The agreements involving the above sales of timber by petitioner generally provided for the sale of standing timber and not of land, and they contained a time limit within which the buyer was permitted to cut and remove the timber from the land on which it stood. There was also a limitation in each of the agreements on the diameter of the timber sold and to be removed, sometimes referred to as selective cutting. On occasions because of the selective cutting provisions of petitioner's contracts and petitioner's retention of title to the land, petitioner was able to sell timber from the same tract to several different purchasers. On occasions petitioner over a period of a year or two would make as many as six separate sales of different types of timber from the same tract, selling pine to one purchaser, peeler logs to another, and saw logs, cordwood, and pulp logs respectively, to other purchasers. During the years here involved petitioner's sales of timber frequently excluded peeler logs. In addition to the sales set forth above, petitioners made other sales during the years 1950 to 1953, inclusive, as to which sales the petitioners retained *29 an economic interest in the timber and respondent allowed capital gains treatment under the provisions of section 117(k)(2) of the Internal Revenue Code of 1939, as follows: Year
Amount
Date Acquired
Cost to
Profit
of Sale
Purchaser
of Sale
by Petitioner
Petitioner
on Sale
1950
Fairhurst
$ 3,323.44
12/12/44
$ 100.00
$ 3,223.44
1950
Long-Bell Lumber Co.
2,526.85
11/23/46
287.13
2,239.72
1950
S.D.S. Lumber Co.
441.80
11/28/45
Unknown
441.80
1951
Leadbetter Logging
37,309.42
1943-46
15,515.84
21,793.58
Co. and Gell & Van
Handel
1951
M & P Lumber Co.
3,139.55
1951
3,139.55
None
1951
Sweet Bros.
2,509.71
1943-46
395.00
2,114.71
1951
Ledgett-Columbia
3,242.77
1946
287.13
2,955.64
Veneer
1951
Universal Bond
$ 2,000.00
1938
Unknown
$ 2,000.00
1951
Turner Bros.
2,369.06
1946
$ 136.18
2,232.88
1951
Wall Boom
247.64
1946
Unknown
247.64
1951
DuBois
212.72
1938
Unknown
212.72
1951
Hagel Creek
508.16
1943
Unknown
508.16
1951
Coast Range Lumber
191.95
1943
Unknown
191.95
Co.
1951
Hokanson Lumber Co.
568.01
1943
Unknown
568.01
1952
Graff
7,157.34
1946
200.00
6,957.34
1952
Hokanson-Wickstrom
8,124.02
1943
Unknown
8,124.02
1952
Turner Bros.
240.95
1946
Unknown
240.95
1952
DeWilde
1,000.00
1943
80.00
920.00
1952
Gross
972.63
1942-45
120.00
852.63
1952
Spaulding
750.00
1943-46
Unknown
750.00
1952
Geil & Van Handel
63,748.30
1943-46
Unknown
63,748.30
1953
Hall-Beebe
5,684.39
1949
50.00
5,634.39
1953
Turner Bros.
281.49
1946
Unknown
281.49
1953
DuBois-Birkenfeld
5,836.44
1943
1,650.00
4,186.44
1953
Lewis County
500.00
Unknown
500.00
1953
Allen
3,968.22
1942
240.00
3,728.22
1953
Gross-Hoppe DeWilde
9,203.38
1943
580.00
8,623.38
1953
V. Whitlow
625.49
1943
Unknown
625.49
1953
Venley
795.84
Unknown
795.84
1953
Beebe-Campbell
2,224.40
1939
160.00
2,064.40
1953
Beebe
3,677.07
1951
2,000.00
1,677.07
1953
Hyde
228.10
1938
Unknown
228.10
1953
Saari
2,500.00
1943
80.00
2,420.00
1953
Cascadia Lumber Co.
12,662.94
1944 & 1950
1,365.00
11,297.94
1953
Gell & Van Handel
37,651.46
1943-46
Unknown
37,651.46
1953
Pacific Shore Lumber
1,546.08
1944
1,222.00
324.08
Co.
1953
Pacific Shore Lumber
2,845.34
1951
800.00
2,045.34
Co.
1953
Geo. E. Miller
4,096.30
Unknown
4,096.30
Lumber
1953
Gibbs
214.73
Unknown
214.73
*30 The contracts covering the above sales of timber generally provided for the sale of standing timber and not of land, and each contract contained a time limit within which the buyer was permitted to cut and remove the timber from the land on which it stood. There was also a limitation in each of the contracts on the diameter of the timber sold and to be removed. During the taxable years 1951, 1952, and 1953 petitioners accepted as payments from sales the following amounts for unauthorized or trespass removals of timber from their lands: Gross Amount
Cost or
Year
Trespass-Cutter
Received
Basis
Profit
1951
Downing
$ 1,311.62
$ 1,311.62
1951
Graff
4,170.93
$ 200.00
3,970.93
1951
Hogen
5,020.00
2,218.00
2,802.00
1952
Ermanson
3,000.00
189.00
2,811.00
1953
Beckman
1,750.00
62.50
1,687.50
1953
Harbor Lumber Company
3,050.25
220.00
2,830.25
Total
$18,302.80
$2,889.50
$15,413.30
The unauthorized removals of timber from petitioner's lands during the taxable years 1951 through 1953 were either reported by the trespasser or discovered by petitioner's employees. Most of the trespasses involved were involuntary and inadvertent, *31 resulting from the person cutting timber on the adjoining tract making a mistake in where the line between the property upon which he had the right to log and the adjoining property lay. In each instance where petitioner received payment during the taxable years here involved for a trespass, the land upon which the trespasser had cut timber was examined by persons employed by petitioner for the purpose of determining the extent of the unauthorized cutting, and in each instance the petitioner and the trespassing party, after negotiations, agreed upon the amount to be paid to petitioner for the trespass. Petitioner believed that during the taxable years trespasses on his property may have been made, either inadvertently or intentionally, which he did not discover. Under sections 8.416 and 8.407 of the Oregon Compiled Laws Annotated, which sections were in effect during the years here involved, a trespasser is liable for treble damages for intentional cutting and removal of timber and for double damages for an involuntary trespass and removal of timber. Petitioners reported the collection from trespass removal of timber as long-term capital gains on their income tax returns for 1951, *32 1952 and 1953. Petitioner during the years here involved owned stock in the Yaquina Bay Mills, Inc., a corporation engaged in the business of a planing mill, and petitioner also acquired other lumber mills from the owners thereof who had purchased timber from him and failed to meet their payments for the timber. Petitioner during some of the years here involved had a contract for sale of logs to Yaquina Bay Mills, Inc. and certain mills to which he had sold or was selling timber as more fully set forth hereinafter. For the year 1950 petitioners, on their income tax return, reported adjusted gross income of $19,683.31. Included in the income so reported was the amount of $67,946.24 shown as the taxable net gain from the sale or exchange of capital assets. In the schedules setting forth the computation of this amount of taxable gain, petitioners showed long-term capital gains from the sales of securities held for a period of over 6 months in the net amount of $23,603.14, resulting from a sales price of such securities of $190,284.86, the cost of the securities being $166,681.72, and a long-term capital gain from timber sales of $94,095.78 computed from showing a selling price of *33 $95,526.11 and a cost of $1,430.33. For the year 1951 petitioners reported an adjusted gross income of $91,701.01. Included in the income so reported was the amount of $128,933 shown as the taxable net gain from the sale or exchange of capital assets. In the schedules setting forth the computation of this amount of taxable gain, petitioners showed long-term capital gains from the sale of securities held over 6 months in the amount of $83,447.64, such amount being the difference in the sales price of $252,696.73 and the cost of $169,249.09, and long-term capital gain from timber sales in the amount of $120,696.43, being the difference in a total selling price of $145,416.08 and total cost of $24,719.66. For the year 1952, petitioners, on their income tax return, reported adjusted gross income of $114,348.93. Included in the income so reported was the amount of $146,161.08 shown as the taxable net gain from the sale or exchange of capital assets. In the schedules setting forth the computation of this amount of taxable gain, petitioners showed a net long-term capital gain from the sale of securities held over 6 months in the amount of $8,462.75, resulting from an aggregate selling *34 price of $56,736.28 for such securities and an aggregate cost of $48,273.53, and gains of $194,763.83 from timber sales, resulting from an aggregate selling price of $198,718.97 less an aggregate cost of $3,955.14. For the year 1953 petitioners, on their income tax returns, reported adjusted gross income of $64,751.60. Included in the income so reported was the amount of $127,221.97 shown as the taxable net gain from the sale or exchange of capital assets. In the schedules setting forth the computation of this amount of taxable gain, petitioners showed a net long-term capital loss from the sale of securities held over 6 months in the amount of $24,752.78, resulting from an aggregate selling price of such securities of $71,660.24 as compared to an aggregate cost of such securities of $96,413.02, and gain from timber sales in the amount of $237,429.45, resulting from an aggregate selling price of such timber of $261,440.27 reduced by an aggregate cost of $24,010.82. In the notice of deficiency, respondent increased petitioners' ordinary income for the year 1950 by the amounts of profit on timber sales indicated below and correspondingly decreased the long-term capital gains reported *35 by petitioners: Adjustments
Ordinary
Long-Term
Income
Capital Gain
Transaction or Item
Increased
(Decreased)
Timber sales by name of purchaser: (a) Stebco Lumber Co.
$25,913.25
[25,913.25)
(b) Columbia-Hudson Lumber Co.
14,682.70
(14,682.70)
(c) A. J. Gross
314.00
(314.00)
(d) Maloney & Lee Chambers
2,600.00
(2,600.00)
(e) Unknown
2,000.00
(2,000.00) Respondent gave the following explanation for these adjustments. It is held that William J. Wineberg is in the trade or business of buying and selling timber and timber lands. Therefore, since you retained no economic interest in the timber sold to the above-listed purchasers, it is determined that your gains on these sales should be reported as ordinary income for the reason that neither section 117(k)(2) nor any other section of the 1939 Code provides for the reporting of the profits as capital gains. For the year 1951, respondent in his notice of deficiency increased petitioners' ordinary income and correspondingly decreased the long-term capital gains reported by petitioners by the amounts shown as representing the profits on timber sales to the purchasers and receipts of payments *36 from unauthorized trespassers accepted by petitioners as payment from sales as follows: Adjustments
Ordinary
Long-Term Capital
Income
Gains Increased
Transaction or Item
Increased
or (Decreased)
Timber sales by name of purchaser: (a) Wagner Bros. Lumber Co.
$12,928.00
[12,928.00)
(b) Sherman Hendrickson
9,700.00
(9,700.00)
(c) Downing
1,311.62
(1,311.62)
(d) Graff
3,970.93
(3,970.93)
(e) Multnomah Plywood
2,212.70
(2,212.70)
(f) P. & W.
4,541.65
(4,541.65)
(g) Hogen
2,802.00
(2,802.00)
(h) Weinert
4,690.00
(4,690.00)
(i) Unknown
3,750.00
(3,750.00) Respondent's explanation for this adjustment was the same as his explanation for the comparable adjustments for 1950. For the year 1952, respondent in his notice of deficiency increased petitioners' ordinary income and correspondingly decreased the long-term capital gains reported by petitioners by the amounts shown as representing the profits on timber sales to the purchasers and receipts of payments from unauthorized trespassers accepted by petitioners as payment from sales as follows: Adjustments
Ordinary
Long-Term
Income
Capital Gains
Transaction or Item
Increased
(Decreased)
Timber sales by name
of purchaser: (b) Peninsula Plywood
$ 972.83
$ (972.83)
(c) Swanberg
971.00
(971.00)
(d) Morris
4,470.00
(4,470.00)
(e) Ermanson
2,811.00
(2,811.00)
(f) Rice Bros.
1,250.00
(1,250.00)
*37 Respondent's explanation for this adjustment was the same as his explanation for the comparable adjustment for 1950. For the year 1953, respondent in his notice of deficiency increased petitioners' ordinary income and correspondingly decreased the long-term capital gains reported by petitioners by the amounts shown as representing the profits on timber sales to the purchasers and receipts of payments from unauthorized trespassers accepted by petitioners as payment from sales as follows: Adjustments
Ordinary
Long-Term
Income
Capital Gains
Transaction or Item
Increased
(Decreased)
Timber sales by name
of purchaser: * * *
(d) Beckman
$1,687.50
[1,687.50)
(e) Guy Roberts Lum-
ber
7,438.97
(7,438.97)
(f) Swanberg
2,000.00
(2,000.00)
* * *
(h) Northern Lumber
4,549.82
(4,549.82)
(i) Harbor Lumber
Co.
2,830.25
(2,830.25) Respondent's explanation for these adjustments was the same as his explanation for the comparable adjustment for 1950. During the taxable years here involved petitioner was engaged in the trade or business of selling timber. b. Profit from Property Exchanges By deed made in June 1950 petitioners conveyed *38 to A. L. MacInnis and Cosima D. MacInnis, doing business as the Wrenn Planing Mill, all of the merchantable timber on certain specifically described property in Lincoln County, Oregon, together with the right to enter upon the land and cut and remove therefrom, any time within 2 years thereafter, the timber conveyed. This deed specifically described the merchantable timber as all timber 16 inches and over in diameter at butt and carried specific provisions for the exercise by the persons to whom the timber was conveyed of care and caution not to injure young or immature trees. It further carried provisions with respect to the compliance by the parties to whom the timber was conveyed of standard logging practices and the payment by them of the taxes levied against the property during the 2-year period and further provided as follows: 4. It is understood that this deed being for timber only that all right and interest of the parties of the second part [the persons to whom the timber was conveyed] to said land or timber shall terminate at the end of two (2) years from this date. In connection with this conveyance, the petitioners received the following: (1) A check for $14,500 dated *39 June 29, 1950; (2) a check for $171.83 dated August 18, 1950; and a deed to timberlands in Lincoln County, Oregon delivered on November 15, 1950, which timberlands were acquired by A.L. and Cosima D. MacInnis from G. K. Litchfield for the price of $10,328.17 on the same date deeded to petitioners. The deed from G. K. Litchfield to A.L. and Cosima D. MacInnis was recorded in Book 142, pages 217-219, Lincoln County Records, and the deed to the same property from A.L. and Cosima D. MacInnis to petitioners was recorded on the same date in Book 142, page 220, Lincoln County Records. The sale of the timber by petitioners to A.L. and Cosima D. MacInnis doing business as Wrenn Planing Mill did not qualify under the provisions of section 117(k)(2) of the Internal Revenue Code of 1939 as a sale in which petitioners retained or reserved an economic interest in the timber. Petitioners, on their income tax return for the year 1950, reported as a long-term capital gain from the sale of timber the amount of $14,671.83 consisting of the cash received from the MacInnises. Respondent, in the notice of deficiency, determined that the petitioners had realized a gain of $25,000 in the year 1950 from *40 the sale of timber to the MacInnises doing business as the Wrenn Planing Mill and that such amount was taxable as ordinary income. On February 10, 1950, petitioner entered into a written agreement with the Monroe Lumber Company, a copartnership, whereby petitioner agreed to sell, and the Monroe Lumber Company agreed to buy, all the down and standing second growth merchantable timber located on certain specifically described lands upon specified terms, conditions, and limitations. One portion of the land described was real property situated in Lincoln County, Oregon which petitioner owned. The other parcel of property specifically described, hereinafter referred to as the Kendall property, was not owned by petitioner, but the agreement specifically recited that petitioner was negotiating for the purchase of the down and standing timber upon that property and that the agreement provided that "this contract shall not apply to the Kendall property until such time as the Kendall timber is acquired by the seller [petitioner]" and provided further if the said "Kendall property is not acquired by the seller [petitioner] within three (3) years from the date of this contract, then at the *41 option of the buyer [the Monroe Lumber Company] the Kendall property shall be eliminated from this contract." The agreement further provided that "It is understood that this contract shall be binding upon the seller to sell and the buyer to buy the timber on the Kendall property if, as and when said timber is acquired by the seller and when so acquired all the terms of this contract * * * shall apply * * * to the Kendall property." The contract specifically granted to the Monroe Lumber Company the right to enter upon the lands to log, cut, and remove timber therefrom and to install the necessary machinery and equipment for the logging operation, and the Monroe Lumber Company agreed to begin logging operations on or before July 1, 1950, and to carry on such operations in an efficient workmanlike manner and in accordance with the standard logging practices of the West Coast fir industry. The contract provided the following with respect to payment for the timber: (a) As logs are harvested from said property they shall be scaled and graded upon the trucks at a station or a point to be agreed upon, by a duly qualified scaler of the Columbia River Log Scaling Bureau, according to Columbia *42 River log scale * * * (b) On or before the 25th day of each month the buyer shall pay the seller [petitioner] on the basis of said scale for all logs removed and scaled during the month immediately preceding. (c) The purchase price of said logs and the amount which the buyer shall pay the seller shall be determined as follows: Four and 50/100 ($4.50) dollars per thousand feet B.M. as a minimum price. If the average selling price of the buyer for lumber manufactured from said logs shall amount to $44.10 per thousand feet B.M., then the buyer shall pay to the seller an additional sum of twenty-three (23() for every advance in said selling price of $2.10 per thousand feet B. M. Settlement to be made as hereinbefore set forth. The agreement further provided that the contract was to be fully performed and all merchantable second growth logs harvested and removed from the premises on or before 10 years from the date thereof and the rights thereunder were not assignable by the Monroe Lumber Company without the written consent of petitioner. It also provided for minimum payments and for the extension of the contract under certain unfavorable market conditions, labor troubles or government *43 controls, and for the minimum size of trees to be cut and for the payment of taxes by the Monroe Lumber Company. The Kendall tract which adjoined the tract owned by petitioner was owned on February 10, 1950, by petitioner's brother-in-law. At that time petitioner thought his brother-in-law, Kendall, wanted to sell the property and that he had agreed to the price. Petitioner's negotiations with Kendall were unsuccessful and he suggested to the Monroe Lumber Company that they negotiate for acquisition of the Kendall tract. Sometime prior to September 13, 1951, the Monroe Lumber Company purchased the Kendall timber for a total price of $31,721. On or about September 13, 1951, the Monroe Lumber Company deeded the timber on the Kendall tract to petitioner pursuant to a supplemental agreement dated September 13, 1951. This supplemental agreement provided in part as follows: That under date of 10th day of February, 1950, a contract was entered into by and between the party of the second part referred to in said contract as the seller [petitioner] and party of the first part referred to in said contract as the buyer [Monroe Lumber Co.], providing for the sale by said seller to said *44 buyer of down and standing timber located on property in Lincoln County, Oregon, and specifically described in said contract, which said contract will be referred to hereinafter as the "Timber Contract"; and WHEREAS, there is set forth in said Timber Contract a specific description of property therein referred to as the "Kendall property"; and WHEREAS, when said Timber Contract was entered into by the parties hereto it was contemplated that the seller therein named would acquire the timber on said Kendall property for the benefit of both parties thereto; and WHEREAS, subsequent to the execution of said Timber Contract party of the first part acquired the timber on said Kendall property in trust for the use and benefit of party of the second part under said contract; and WHEREAS, the party of the first part advanced for the benefit of party of the second part and paid to the said Kendall and others for said timber the sum of $31,721.00; and WHEREAS, the parties hereto have now agreed that the party of the second part shall reimburse the party of the first part to the amount of $31,721.00 and that party of the first part will execute to party of the second part a deed or deeds *45 of all of the timber on said Kendall property, with the exception of timber in Sections 16 and 21; NOW, THEREFORE, in consideration of the foregoing premises and of the mutual covenants and agreements hereinafter contained it is agreed between the parties hereto as follows: 1. Party of the first part [Monroe Lumber Co.] hereby agrees to execute a deed or deeds to party of the second part [petitioner] of all of the interest of party of the first part in and to the down and standing merchantable timber located upon the following described real property in Lincoln, County, Oregon, to-wit: [Description of Kendall timber follows] 2. The parties agree that all of the timber on the property above described shall be included in and considered a part of the timber sold by the seller to the buyer under said Timber contract and subject to the terms and conditions stated and set forth in said Timber Contract. 3. Party of the second part agrees that party of the first part shall charge the account of party of the second part with said sum of $31,721.00 and the said party of the first part is hereby authorized to deduct said amount from moneys due and to become due party of the second *46 part under said Timber Contract. 4. This contract insofar as it may be applicable shall be construed in connection with and as a part of said Timber Contract. 5. This contract shall be binding upon and enure to the benefit of the parties hereto, their heirs, executors, administrators and assigns. The amount of $31,721 was deducted by the Monroe Lumber Company from amounts then due petitioner or to become due him under the agreement dated February 10, 1950. Petitioners received from the Monroe Lumber Company for the cutting of timber on the Lincoln County property, exclusive of timber cut from the Kendall tract, the amounts of $41,964.24 in 1951, $89,973.44 in 1952, and $41,625.61 in 1953 which were reported by them as long-term capital gains in the respective years on their income tax returns. [2]
Respondent in his notice of deficiency determined that petitioners were entitled to capital gain treatment under section 117 (k)(2) *47 of the Internal Revenue Code of 1939 with respect to the above recited amounts for the years 1951, 1952, and 1953, and that they realized additional unreported capital gain of $31,721 in the taxable year 1951 representing the purchase price of the Kendall timber paid by Monroe Lumber Company and deducted from the stumpage amounts then due and owing to petitioner for the Lincoln County timber. On August 27, 1952, petitioners entered into an agreement with Springfield Plywood Corporation, whereby petitioners as sellers agreed to sell and convey to the Springfield Plywood Corporation, the buyer, all of the merchantable timber located upon certain specifically described lands in Curry County, Oregon. This agreement further provided as follows: * * *
2. The purchase price which the buyer agrees to pay to the sellers [petitioners] is the sum of ninety-one thousand dollars ($91,000.00), payable as follows: (a) Twenty thousand dollars ($20,000.00) upon the execution of this contract, the receipt whereof is hereby acknowledged. (b) Eleven thousand dollars ($11,000.00) on or before October 15, 1953. (c) The balance of said purchase price, to-wit: Sixty thousand dollars ($60,000.00) *48 shall be paid by the buyer conveying or causing to be conveyed to the sellers by good and sufficient warranty deed, free and clear of encumbrances, except water rights and reservation hereinbefore stated, the land and timber described in and to be acquired by the buyer under said North Pacific Contract. And in connection with said North Pacific Contract the buyer agrees to perform all of the terms, conditions and covenants set forth in said North Pacific Contract and to make the payments therein required of the buyer to the end that the buyer will acquire said property described in the North Pacific CONTRACT and to convey said property or cause the same to be conveyed to the seller at the time and in the manner and form set forth in said North Pacific Contract. The agreement of August 27, 1952, recited that Springfield Plywood Corporation had on even date entered into a written contract with North Pacific Plywood, Inc., a Washington Corporation, to purchase the specifically described land in King County, Washington, hereinafter referred to as the North Pacific tract. The contract provided that all the timber should be logged and removed on or before November 15, 1953, and unless *49 so removed and paid for all rights and interest of the Springfield Plywood Corporation in and to the timber and under the contract should immediately cease and determine with certain provisions for extension of time. It also provided that the logging should be carried on in accordance with standard practices and with reasonable care and precaution not to unnecessarily destroy or damage trees left standing and carried a definition of the measurements required to constitute merchantable timber which was sold. Petitioners received in connection with this contract the following: (1) A check for $20,000 dated August 27, 1952 from Springfield Plywood Corporation; (2) a check for $11,000 dated July 3, 1953; and (3) a deed executed by North Pacific Plywood, Inc. as grantor to William J. Wineberg, dated September 3, 1952, to timberlands in King County, Washington, placed in escrow with the National Bank of Washington, escrow agent, in accordance with an agreement between the parties, the deed being delivered to petitioner on or about September 23, 1953, upon completion of payments made by Springfield Plywood Corporation on the purchase price of the property. Springfield Plywood Corporation *50 made payments in the total amount of $60,000 to the National Bank of Washington, escrow agent, as follows: September 16, 1952
$13,886.60
October 16, 1952
13,062.40
September 23, 1953
33,051.00
$60,000.00
The transactions between petitioner and Springfield Plywood Corporation did not qualify under the provisions of section 117(k)(2) of the Internal Revenue Code of 1939 since petitioner did not retain or reserve an economic interest in the timber. North Pacific Plywood, Inc. and Springfield Plywood Corporation had entered into a contract dated August 26, 1952 whereby North Pacific Plywood, Inc. agreed to sell and Springfield Plywood Corporation agreed to buy the timberlands in King County, Washington which were in accordance with the agreement between those two corporations conveyed by North Pacific Plywood, Inc. to petitioner by the deed of September 3, 1952, heretofore listed as being received by petitioner. The sale of timber on the Curry County tract owned by petitioner to Springfield Plywood Corporation and the receipt in part payment therefor of the deed to the North Pacific tract by petitioner was negotiated by petitioner. The transaction was recorded *51 on the books and records of the Springfield Plywood Corporation as a purchase of timber from petitioner for $91,000. Petitioners, on their income tax return for 1951, reported a gain of $20,000, and on their return for 1953, a gain of $11,000, from the sale of timber to Springfield Plywood Corporation in accordance with the contract of August 27, 1952, and included these amounts as long-term capital gain. Respondent in his notice of deficiency treated the entire $91,000 as ordinary income in the year 1952. Sometime prior to January 8, 1953, Henry Pritzlaff, who was a partner with Ercill Wilson in a logging business, doing business under the name of Canyon Logging Company or Parkett Logging Company, commenced negotiating with petitioner for the purchase of timber on lands owned by petitioner in Linn County, Oregon, known as the Fox Valley or Wineberg tract, hereinafter referred to as the Fox Valley tract. Pritzlaff and Wilson were experienced loggers operating in Linn County, Oregon. The negotiations between petitioner and Pritzlaff and Wilson contemplated the sale of the timber on the Fox Valley tract to Pritzlaff and Wilson for cash. There was no understanding by Pritzlaff and *52 Wilson that petitioner sought to trade the Fox Valley Timber for other timberlands. Pritzlaff gave petitioner a check, dated January 7, 1953, in the amount of $5,000 in partial payment for the Fox Valley timber and Wilson gave a check dated January 8, 1953, to petitioner in the amount of $7,000. An agreement of sale dated January 8, 1953 between petitioners and Pritzlaff and Wilson provided in part as follows: That WHEREAS, the sellers [petitioners] are the owners of the following described real property located in Linn County, Oregon, to-wit: The West half (W 1/2) of the Southwest quarter (SW 1/4) of Section 35, Township 9 S.R. 2 E. of the W.M. (approximately 82.20 acres), [also known as the Fox Valley or Wineberg tract] together with the timber located thereon, which property will hereinafter be referred to as the Linn County property; and WHEREAS, the buyers [Pritzlaff and Wilson] desire to purchase the timber on said Linn County property and the sellers are willing to sell the timber thereon on the terms and conditions herein set forth; and WHEREAS, the buyers, or some of them, are the owners of the following described real property in Lincoln County, Oregon, to-wit: *53 [Description of Maesfrancx property near Newport, Lincoln County, Oregon, as follows] which said property is free and clear of encumbrances and will hereinafter be referred to as the Lincoln County property; NOW, THEREFORE, in consideration of the foregoing premises and of the mutual covenants and agreements hereinafter set forth it is agreed between the parties hereto as follows: 1. The sellers hereby bargain, sell and convey to the buyers all of the merchantable timber located and being upon the Linn County property. * * * 2. The purchase price which the buyers hereby agree to pay to the sellers is the sum of Twenty-five thousand ($25,000.00) dollars, payable as follows: Twelve thousand ($12,000.00) dollars upon the execution of this contract, the receipt whereof is hereby acknowledged. The balance, to-wit: the sum of thirteen thousand ($13,000.00) dollars payable by the buyers conveying or causing to be conveyed to the sellers by good and sufficient warranty deed * * * the Lincoln County property. 3. The buyers further agree at the time said warranty deed is executed to furnish to the sellers a good and sufficient title policy insuring the title to said Lincoln County *54 property subject to the restrictions hereinabove set forth and the sellers likewise agree to furnish to the buyers a title policy showing clear and unencumbered title to said Linn County property. 4. It is understood and agreed that all timber hereunder shall be logged and removed on or before two (2) years from the date of this contract. The agreement dated January 8, 1953, was actually handed to Pritzlaff and Wilson for signing sometime after that date. On January 8, 1953, when payment of the two checks totaling $12,000 was made to petitioner, a third check in the amount of $13,000 was drawn by Wilson to Louis Rodakowski at the direction of petitioner or his attorney. Petitioner's attorney informed Pritzlaff and Wilson that the necessary papers would come along in due course of time. Neither Pritzlaff nor Wilson knew Louis Rodakowski, to whom the check for $13,000 dated January 8, 1953 was drawn by Ercill Wilson, but the $13,000 check to the order of Louis Rodakowski was drawn by Wilson in compliance with petitioner's instructions. The Maesfrancx property referred to and described in the agreement dated January 8, 1953, hereinafter referred to as the Maesfrancx tract, was *55 owned at the time of his death by Peter J. Maesfrancx. Peter J. Maesfrancx died testate on March 27, 1951, leaving surviving as his heirs-at-law his sister Eugenia Maesfrancx, now Eugenia Roosens, and his niece Mary Roosens, now Mary Buytaert. Louis Rodakowski, a Catholic priest at the Sacred Heart Church in Newport, Oregon, qualified as executor of Peter J. Maesfrancx's estate. By Maesfrancx's will the Maesfrancx tract except the timber thereon was devised to the Archdiocese of Portland, Oregon, and the timber or proceeds from the sale thereof was left to Eugenia Maesfrancx and Mary Buytaert. On October 24, 1952, by order of the County Court of Lincoln County, Oregon, the Archdiocese of Portland, Oregon acquired title to the Maesfrancx tract excepting the timber standing thereon. By the same order the Archdiocese of Portland, Oregon acquired custody of the timber from Maesfrancx's estate with Louis Rodakowski holding the timber as trustee for the Maesfrancx heirs. Louis Rodakowski was also given a power of attorney to sell the timber and to account for the proceeds to Eugenia Maesfrancx and Mary Buytaert. As soon as the Maesfrancx property was placed on the market, Louis Rodakowski *56 began to receive inquiries with respect to the property and offers from prospective buyers. Several months prior to November 1952 Rodakowski had mentioned to petitioner that he was executor of an estate and as such had some timber. Rodakowski told petitioner that he wanted at least $5,000 for the church and petitioner had promised Rodakowski that if he were afforded the opportunity of purchasing the timber and the land, he would see that Rodakowski received a contribution to the church of $5,000. Thereafter, petitioner became sick and later went to Arizona. Petitioner's accountant, Middlebrook, and the manager of the Wineberg Timber Company, Moses, represented petitioner in negotiating with Rodakowski for the purchase of the land and timber. Rodakowski contacted Middlebrook and an attorney in Newport, Oregon, named Hollen to whom closed bids or offers had been handed for the timber on the Maesfrancx tract, with respect to the land and timber. Thereafter, a resident of Lincoln County made an offer to Rodakowski of $15,000 for the land and timber. Rodakowski reported this offer to Middlebrook and Moses who offered him, on behalf of petitioner, $16,000. The other prospective purchaser *57 then offered $17,000 and Moses and Middlebrook stated that petitioner would pay $18,000 for the property. Rodakowski consulted his advisers in the parish and they advised him to make the transaction with petitioner since petitioner had given the first offer to buy the land and timber and make a contribution to the church. Either Moses or Middlebrook had told Rodakowski that petitioner had asked someone who owed money to him to make out the check directly to Rodakowski. Rodakowski did not know either Pritzlaff or Wilson. Rodakowski was always under the impression that the sale of the Maesfrancx tract and timber was being made to petitioner in accordance with the agreement Rodakowski had reached with Middlebrook and Moses. Rodakowski signed two separate contracts of sale, each dated November 10, 1952, one agreeing to sell under his power of attorney the timber on the Maesfrancx property for $12,000 and the other agreeing to sell the land for $1,000. At the time Rodakowski signed these instruments on or about November 10, 1952 he thought the purchaser of the property was petitioner. The documents themselves, other than the printed portion thereof, are typed in green type, except that *58 the name and address of the purchaser Ercill Wilson and the words, "The Archdiocese of Portland in Oregon, an Oregon Corporation" in the beginning portion of the document agreeing to the sale of the land are typed in black type. The documents disclose clearly that there has been an erasure of green typing over which the black type has been imposed. Each of these documents provides for the payment of the amount therein recited upon delivery of a warranty deed and title insurance. A deed from the Archdiocese of Portland in Oregon, an Oregon corporation, to petitioner, subscribed and sworn to by the president and secretary of that corporation on the 9th day of December 1952, conveyed to petitioner the land in the Maesfrancx tract, and a deed dated December 24, 1952, signed by Rodakowski as attorney in fact for Eugenia Maesfrancx, Mary Buytaert and Frederic Roosens Buytaert, her husband, conveyed to petitioner the timber on the Maesfrancx tract. Each of these deeds was filed and recorded in Lincoln County, Oregon on January 26, 1953. Under date of January 12, 1953 Louis Rodakowski received a letter entitled, Supplemental Report, from the Title and Trust Company, Lincoln County Branch, *59 stating that that company was prepared to issue a title insurance policy in the usual form as of January 12, 1953, at 8:00 p.m. insuring title to the timber on the Maesfrancx tract and to the land. On or about January 8, 1953, either Moses or Middlebrook delivered petitioner's check for $5,000, made payable to the Sacred Heart Church, to Rodakowski, and Rodakowski was told either by Middlebrook or Moses that a check in the amount of $13,000 payable to him would be sent to him by a person who was indebted to petitioner. The contracts of sale of the timber on the Maesfrancx tract and of the land, each dated November 10, 1952, which were signed by Rodakowski on or about that date were signed by Wilson sometime in January 1953 at the request of either petitioner or someone representing petitioner. Wilson at the same time signed an assignment of each of these contracts, each of the assignments being as follows: KNOW ALL MEN BY THESE PRESENTS, That I, ERCILL WILSON, for a good and valuable consideration hereby sell, transfer and assign to WILLIAM J. WINEBERG all of my right, title and interest in and to the within and attached contract and to the timber and real property therein described. *60 Dated this 8th day of January, 1953. Wilson signed the contracts and executed the assignments in compliance with what he considered petitioner's requirements in order to obtain the Fox Valley timber. On their income tax return for 1953 petitioners reported the sale of the Fox Valley timber to Pritzlaff and Wilson as resulting in long-term capital gain of $12,000. Respondent in the notice of deficiency determined that petitioner received ordinary income in the amount of $25,000 from the sale of the Fox Valley timber, with the following explanation: Relative to the sale of timber to Pritzlaff & Wilson * * * it is determined that the transaction does not fall within the scope of section 112(b)(1) as an exchange of like properties held for productive use in trade or business or for investment. It is accordingly held that the entire realized gain is taxable in the year of sale. Issue 2. Disposition of Timber in Which Petitioners Claim to Have Retained an Economic Interest Monroe Lumber Company cut and removed specified quantities of the Kendall timber in 1952 and 1953 pursuant to the agreement dated February 10, 1950, and supplemental agreement dated September 13, 1951, portions *61 of which have heretofore been set forth. Petitioner received from the cutting of the Kendall timber by Monroe Lumber Company the amount of $3,909.40 in 1952 and $30,496.75 in 1953. These amounts were reported by petitioners as long-term capital gain in their income tax returns for the years 1952 and 1953. Other facts with respect to the disposition of the timber on the Kendall tract are set forth under Issue 1(b) involving claimed exchanges of like properties. Respondent in his notice of deficiency determined that the amounts received by petitioner from the cutting of the Kendall timber did not qualify for capital gains treatment and that such amounts less depletion costs in the amounts of $1,384.30 and $12,328.38 were taxable as ordinary income with the following explanation: You reported long-term capital gain on the sale of timber to the Monroe Lumber Co. from the Kendall tract. However, since your February 10, 1950 timber-cutting contract with the Monroe Lumber Co. actually predates your acquisition of the Kendall tract on September 13, 1951, it is held that you did not hold the timber for six months prior to disposal. As this is an indispensable requirement of section 117(k)(2), *62 you are not entitled to report the profit on disposal of the Kendall timber as a long-term capital gain under the provisions of such section or any other section of the 1939 Code. On November 10, 1952, petitioner entered into an agreement with J. L. Ledgett. Under the terms of this agreement petitioner sold to Ledgett for $30,000 all of the merchantable timber on certain real property owned by petitioner in Linn County, Oregon. Petitioner received a payment in the amount of $5,000 on the purchase price upon the execution of the contract and the balance of $25,000 was paid to petitioner in 1953. The agreement, dated November 10, 1952, provided in part as follows: That WHEREAS the seller is the owner of the following described real property located in Linn County, Oregon, to-wit: [Description of timberlands follows] WHEREAS, the buyer is desirous to purchase the timber on said above described tract and the seller is willing to sell said timber on the terms and conditions hereinafter set forth; NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements herein contained it is agreed between the parties hereto as follows: 1. The seller hereby *63 sells to the buyer and the buyer hereby purchases of the seller all of the merchantable timber located and being upon the above described real property. Provided, however, that any trees measuring less than sixteen (16) inches breast high shall not be deemed to be merchantable timber and are not included in this contract. 2. The buyer agrees to pay to the seller for said timber the sum of thirty thousand dollars ($30,000.00), payable as follows: (a) Five thousand ($5000.00) dollars upon the execution of this contract, the receipt whereof is hereby acknowledged. (b) Five thousand ($5000.00) dollars upon the day the buyer begins logging said tract of timber and before any logs or timber are removed therefrom. (c) The balance of twenty thousand ($20,000.00) dollars, plus interest at six per cent per annum, on all deferred payments shall be paid as follows: Twenty ($20.00) dollars per thousand feet B.M. for all saw logs developed and removed from said tract and $35.00 per thousand feet B.M. on all peeler logs developed and removed from said tract. Said payments to be made between the first and tenth of each month for all saw logs and peeler logs removed during the month immediately *64 preceding. * * *
3. It is understood that all timber sold hereunder shall be logged, removed and paid for on or before one (1) year from the date hereof and unless so removed and paid for as herein provided all rights and interest of the buyer in and to said timber and under this contract shall immediately cease and determine. Provided, however, that the buyer may extend this contract for an additional period of one (1) year by payment to the seller of the sum of $500.00. * * *
8. The buyer further agrees that in said logging operations and in the removal of said timber reasonable care and precaution will be taken and observed * * *
10. In the event the buyer fails or refuses to make the payments required hereunder at the date and in the manner herein stipulated, or in the event the buyer for any reason fails or refuses to keep and perform all the terms, conditions and covenants of this contract * * * then and in either event the seller shall have the right * * * to cancel this contract. Whereupon, all interest of the buyer in and to said timber shall immediately cease and determine and any payments theretofore made by the buyer hereunder shall be deemed and considered *65 liquidated damages for such default or defaults and shall be forfeited to the seller. Petitioners acquired the Linn County timberlands in 1941 at a cost of $1,673.19. After Ledgett had made the first two payments called for by the transaction aggregating $10,000, petitioner agreed to accept payment of the remaining $20,000 by Ledgett as he sold the logs. Petitioners reported the $5,000 payment by Ledgett on their 1952 return as long-term capital gain and $23,326.81 of the $25,000 payment in 1953 was similarly reported by petitioners on their income tax returns as long-term capital gain. In his notice of deficiency respondent determined that the entire gain from the sale of the timber in the amount of $28,326.81 was taxable as ordinary income in 1952 with the explanation that petitioner was engaged in the trade or business of selling timber and timber lands and: Relative to the sale of timber to J.L. Ledgett * * * it is held that the transaction constituted a deferred-payment sale not on the installment plan. As such, the realized gain computed under the provisions of section 111 is recognizable in full in the year of sale under section 112(a) of the Internal Revenue Code of 1939. *66 Petitioner now contends in the alternative that if respondent is sustained in his determination that petitioner was engaged in the trade or business of selling timber, the gain from the timber sale to Ledgett is nevertheless entitled to be treated as long-term capital gain because of petitioner's retention of an economic interest in the timber. Issue 3. Production Royalties as Capital Gains An agreement entered into on July 5, 1951, between petitioner as seller and Cascadia Lumber Company, an Oregon corporation, the stock of which was owned by George E. Miller, [3] as purchaser, provided in part as follows: That WHEREAS, the purchaser is now constructing and equipping a saw mill upon the Yaquina River in Lincoln County, Oregon, on what is known as the Gilky property. That said mill when completed will have an average manufacturing capacity of 100,000 feet B.M. of lumber per day; and WHEREAS, said mill, which will hereinafter be referred to as the river mill, will be completed and ready for operation on or before June 1, 1952; and WHEREAS, the seller is the owner of timber lands in Lincoln County, Oregon, the timber upon which he has offered to sell and reserve to the buyer *67 on the terms and conditions herein set forth; and WHEREAS, the buyer is desirous of procuring timber reserves from the seller and of purchasing timber of the seller for cutting and manufacturing at said river mill; NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements herein contained and of the further consideration of one ($1.00) dollar each to the other in hand paid, the receipt whereof is hereby confessed and acknowledged it is agreed between the parties hereto as follows: 1. The timber comprehended and included in this contract is located on the lands described in Schedule A hereto attached. Seller covenants that he is the owner of all of these lands and the timber thereon. It is understood, however, that there may be title defects as to some parcels which will require curing and may require suit or action to quiet title and seller agrees at his own expense to take such steps and proceedings as may be necessary to that end. 2. The seller agrees to sell and the purchaser agrees to buy all of the second growth, down and standing merchantable timber located upon the property set forth in said Schedule A and all of the old growth timber, *68 except logs which will grade No. 1 and No. 2 peelers and also except No. 3 peelers which are not sawn by the buyer in said river mill on the following terms and conditions: (a) The purchase price of said timber shall be twelve per cent of the purchaser's average gross sales price of all lumber sold at or from river mill during the month covered by each monthly remittance respectively, computed on the quantity of lumber manufactured from the logs recovered or harvested from said timber lands provided the minimum price of said timber shall be $7.00 per thousand feet B.M. (b) In arriving at the average sales price for the purposes above stated only said sales price on lumber grading No. 2 and better shall be considered. (c) The purchase price as above computed shall be paid between the first and tenth of each month for all lumber so manufactured during the preceding month and if said 12% does not amount to $7.00 per 1000 ft. B.M. on all logs harvested during said month, then any such deficiency shall likewise be paid to the seller. (d) For the purpose of computing the purchase price, in the event said twelve per cent does not aggregate in any one month the minimum price of $7.00 *69 per thousand feet B.M., an accurate scale of all logs shall be made on trucks at the pond or at the river at said river mill by a scaler satisfactory to the seller, a copy of all scale sheets to be furnished daily to the seller. * * *
14. As a further consideration for this contract the purchaser agrees to pay to the seller the sum of seventy-five cents per thousand feet B.M. for all lumber manufactured at said river mill. Said payment to be made between the first and tenth of each month for all lumber manufactured during the month immediately preceding. This obligation to begin when said river mill is completed and in operation and shall continue during the life of this contract and any extension thereof. 15. This contract shall be and remain in force from the date hereof for and during a period of ten (10) years. Any timber not removed within said ten (10) year period shall revert to the seller. Whereupon, this contract shall cease and determine. Provided, however, that if during said ten year period the purchaser has begun its logging operations in the removal of said timber and provided further if the purchaser has in all respects kept and performed the terms of this contract *70 on its part to be kept and performed then and thereupon the purchaser shall have the right to extend this contract for an additional period of ten (10) years, and if at the end of said ten year extended period the buyer has in all respects kept and performed the terms of this contract on its part to be kept and performed, then and thereupon the purchaser shall have the right to extend this contract for an additional ten years. * * *
17. * * * there is * * * excepted from this contract whatever timber may have been sold to mills which are designated in a contract entered into between the seller and Yaquina Bay Mills, Inc. under this date as contract mills. This contract contained specific provisions for the care to be taken by the purchaser in logging, for the payment *71 of taxes by the purchaser on all of the property described in the attached schedule after March 15, 1951, as long as the contract was in force or until the timber was harvested from the lands described, for the cancellation of the contract at the seller's option in case of the insolvency or bankruptcy of the purchaser, and for the option of the seller to terminate the contract in case of default in any of the covenants by the purchaser. Schedule A attached to the contract consisted of eight typewritten pages containing a description of over 100 separate parcels of land. The contract of even date referred to in the agreement of July 5, 1951, between petitioner and Cascadia Lumber Company is an agreement entered into on July 5, 1951, between petitioner as party of the first part and Yaquina Bay Mills, Inc., an Oregon corporation, as party of the second part, which provided in part as follows: WHEREAS, party of the second part [Yaquina Bay Mills, Inc.] owns and is now operating a planing mill and remanufacturing plant for the surfacing and processing of lumber, said mill being located in Newport, Lincoln County, Oregon; and WHEREAS, party of the second part for the purpose of *72 operating its said plant purchases rough lumber from various small sawmills cutting lumber in Lincoln County, Oregon, and territory tributary to the plant of party of the second part and thereafter surfacing, grading, processing, selling and shipping said lumber; and WHEREAS, party of the first part [petitioner] has agreements with sawmills in Lincoln County requiring said mills to sell and deliver their respective lumber outputs to party of the second part at the prevailing market price at the time of delivering said lumber to the said party of the second part; said saw mills being hereinafter referred to as contract mills; and WHEREAS, the George E. Miller Lumber Co. of Portland, Oregon, a copartnership, has heretofore acquired of party of the first part ownership of ninety per cent of the capital stock of party of the second part and has become sales agent for party of the second part in the sale of lumber and lumber products; and WHEREAS, party of the first part has sold or is selling timber to the said contract mills and in a position to otherwise control the output of some of said contract mills; and WHEREAS, party of the first part has arranged with said contract mills *73 who are now delivering lumber to party of the second part to continue selling and delivering their lumber output to party of the second part at the market price prevailing at the time of delivery; and WHEREAS, under even date herewith a contract was entered into between party of the first part as seller and Cascadia Lumber Company, a corporation, as purchaser, providing for the sale by seller to the purchaser of timber in said Lincoln County, which said contract will hereinafter be referred to as the master contract; and * * *
WHEREAS, said George E. Miller Lumber Company is the owner of practically all of the capital stock of Cascadia Lumber Company and is in control of said company and its operations; and WHEREAS, said master contract and this contract are entered into concurrently as a part of a general plan to assist party of the second part in procuring lumber for its operations and supplying timber to prospective contract mills and to otherwise coordinate the operations of party of the second part and the Cascadia Lumber Company to their mutual benefit and advantage; and * * *
NOW, THEREFORE, in consideration of the foregoing premises and of the mutual covenants *74 and agreements hereinafter set forth and the further sum of $1.00 each to the other in hand paid it is agreed between the parties hereto as follows: * * *
2. Party of the second part agrees to pay to party of the first part seventy-five cents per thousand feet on all lumber surfaced or processed at said plant of party of the second part, payable between the first and tenth of each month for all lumber surfaced or processed during the month immediately preceding. * * *
6. It is agreed that this contract shall take effect on the first day of June, 1951, and shall continue and remain in effect as long as said master contract remains in effect, it being understood and agreed that the term of this contract shall run concurrently with the term of said master contract. On their income tax returns for the years 1951, 1952, and 1953 petitioners reported as ordinary income from production royalties the following amounts: 1951
$ 9,008.15
1952
15,314.76
1953
17,774.55
In the notice of deficiency respondent made no change with respect to the amounts reported by petitioners as production royalties for any one of the years 1951 through 1953. Petitioner now *75 contends that he erroneously reported the amounts denominated as production royalties as ordinary income in each of the years 1951, 1952 and 1953 but that these amounts in fact were capital gains. Issue 4. Deferred Payment Sales Petitioner's income tax returns for the years 1952 and 1953 were filed on the cash receipts and disbursements basis. The facts with respect to petitioner's sale of timber to J. L. Ledgett in 1952 and respondent's determination with respect thereto have been set forth in connection with sales with respect to which petitioner claims to have retained an economic interest. On June 17, 1953, petitioners entered into an agreement with Dollar & Patterson, Inc., providing for the sale of timber located on certain Douglas County, Oregon lands owned by petitioners. The agreement dated June 17, 1953, provided in part as follows: 1. The sellers [petitioners] hereby sell and the buyer [Dollar & Patterson, Inc.] hereby buys all of the down, standing and merchantable timber located upon the above described lands. Provided, however, that any trees measuring less than 16 inches in diameter, breast high, shall not be deemed to be merchantable timber and are not *76 included in this contract. 2. The purchase price for the timber so sold by the sellers and purchased by the buyer shall be forty thousand ($40,000.00) dollars, payable as follows: (a) Five thousand ($5000.00) dollars on the execution of this contract, the receipt whereof is hereby confessed and acknowledged. (b) Fifteen thousand ($15,000.00) dollars on or before July 15, 1953, and twenty thousand ($20,000.00) dollars on or before January 2, 1954. 3. It is understood and agreed that no timber shall be cut or removed from the above described premises until all of said purchase price has been paid. 4. The buyer covenants and agrees to conduct and carry on all logging operations in the removal of said timber in an efficient workmanlike manner and in accordance with standard logging practices as the same prevail in the West Coast lumber industry, * * *
6. The buyer further agrees that in the logging operations and the removal of said timber reasonable care and precaution will be taken so as not to unnecessarily damage or destroy trees left standing. * * *
8. It is further understood and agreed that all timber sold and purchased hereunder shall be removed on or before *77 January 1, 1956, and any timber not cut and removed on or before said limitation date shall revert to and become the sole property of the sellers. * * * 9. It is understood and agreed that prompt payment of the purchase price as herein agreed upon shall be the essence of this contract and any failure on the part of the buyer to make said purchase price payments promptly and in accordance with this contract shall give to the sellers the right and option to cancel this contract without further notice and to terminate any and all interest of the buyer in and to said timber. All payments therefore made shall be forfeited to the sellers as liquidated damages for the breach of this contract. 10. This contract shall be binding upon and inure to the benefit of the parties hereto, their heirs, executors, administrators, successors and assigns. Petitioners received $30,000 from Dollar & Patterson, Inc., in 1953 and the balance of the sales price in the amount of $10,000 was received by petitioners in the following year. Petitioners reported the transaction with Dollar & Patterson, Inc., in their income tax return for 1953 as resulting in the realization of long-term capital gain in the *78 amount of $26,500 computed as follows: Date Ac-
Date
Selling
Cost or
Net
quired
Sold
Price
Basis
Profit
1943
June 1953
$30,000
$3,500
$26,500 Respondent, in his notice of deficiency, determined that petitioner realized $36,500 ordinary income from this transaction with the following explanation in addition to the general explanation that petitioner was engaged in the trade or business of selling timber and timberlands: Relative to the sale of timber to Dollar & Patterson, Inc. * * * it is held that the transaction constituted a deferredpayment sale not on the installment plan. As such, the realized gain computed under the provisions of section 111 is recognizable in full in the year of sale under section 112(a) of the Internal Revenue Code of 1939. Issue 5. Receipts from Use of Road In 1944 petitioner had acquired timberlands in Lincoln County, Oregon, hereinafter referred to as the Lincoln County tract, which were the subject of the contract of February 10, 1950 between petitioner and the Monroe Lumber Company hereinbefore set forth. Sometime prior to 1950 petitioner had entered into a contract with the Noble Lumber Company pursuant *79 to which that company was granted the right to cut and remove timber from the Lincoln County tract on a basis of paying for the timber as it was cut. In order to proceed with the cutting of the timber, the Noble Lumber Company had built certain access roads on and over the Lincoln County tract. The Noble Lumber Company encountered financial difficulties and forfeited and terminated by agreement with petitioner its contract for cutting timber on the Lincoln County tract. Petitioner paid Noble Lumber Company for the construction of the roads and improvements on the Lincoln County tract. The agreement of February 10, 1950, as heretofore in part set forth, whereby petitioner sold certain second growth timber on the Lincoln County tract to Monroe Lumber Company provided in part as follows: 10. The buyer agrees to pay the seller [petitioner] upon demand the sum of four thousand ($4,000.00) dollars as compensation for roads established by the seller and road work performed by the seller. The buyer to have the unrestricted use of such roads during the life of this contract. Pursuant to this agreement Monroe Lumber Company paid petitioner the sum of $4,000 in the year 1950. Petitioners *80 reported this payment of $4,000 as long-term capital gain on their income tax return for 1950. Respondent determined that the $4,000 payment was ordinary income and gave the following explanation: The $4,000.00 received by you from the Monroe Lumber Co. as compensation for use of roads is held to be ordinary income. Issue 6. Increased in Petitioners' Income Over the Amounts Shown in the Notice of Deficiency as Affirmatively Alleged by Respondent (a) From the Gain on the Sale of Yaquina Bay Mills, Inc., Stock Yaquina Bay Mills, Inc., was incorporated on April 24, 1950, under the laws of the State of Oregon with an authorized capital stock of 1,500 shares of common stock, par value $100 per share. The incorporators were petitioner, Aaron H. Ingram, and James A. Fuller. They subscribed to the stock of the corporation as follows: Number of
Shares
Amount
Petitioner
675
$ 67,500
Aaron H. Ingram
819
81,900
James A. Fuller
6
600
1,500
$150,000
An agreement entered into between petitioner and Aaron Ingram on February 15, 1950, providing for the incorporation of Yaquina Bay Mills, Inc., provided, in part, as follows: NOW, THEREFORE, THIS AGREEMENT *81 WITNESSETH: That the First Party [petitioner], in consideration of the premises and of the covenants and conditions of the Second Party [Aaron Ingram] herein, does hereby agree as follows: 1. That he agrees to, and does hereby, contribute the sum of Five Thousand and no/100 ($5,000.00) Dollars to the Second Party, receipt of which is hereby acknowledged by the Second Party, which shall constitute his contribution to the working capital of the parties pending the said incorporation. 2. That he will, upon completion of the incorporation or at the date of the arrival of One-Yates Planer upon the dock at Newport, Lincoln County, Oregon, or at such other time as is deemed necessary by the Second Party, contribute the sum of Fifteen Thousand and no/100 ($15,000.00) Dollars as a further advance of working capital pending the incorporation. 3. That he will, upon the date of incorporation, deed to the said corporation such quantities of timber land as will equal in value the sum of Fifteen thousand and no/100 ($15,000.00) Dollars, said timber to be valued at the existing price currently being received for timber of similar kind and quality in the surrounding territory as of the date *82 of delivery of the deed. 4. That he will, from time to time, execute with the said corporation such option agreements as shall be deemed advisable by the said corporation, which said option agreements shall give to the corporation the exclusive right to purchase the stipulated quantities of his timber the corporation to pay for such options, the taxes upon the timber option, plus the three (3) per cent interest charge on the minimum valuation of the timber so optioned. 5. That he will execute with the said corporation a binding agreement granting unto the said corporation a first option to purchase all or any of his timber in Lincoln County, Oregon, at the refusal price; it being the intent of the parties that the first party shall sell none of his timber in Lincoln County, Oregon, without first giving the corporation the opportunity to buy said timber at the refusal price. 6. That the first party will, and he hereby agrees, that he will sell none of his timber in Lincoln County, Oregon, after the date hereof until the date of the said incorporation, or until the 31st day of December, 1950, which ever is the earlier, PROVIDED HOWEVER, that the First Party shall be and he is *83 hereby granted the right to sell portions of his timber upon receiving written consent thereto from the Second Party. The original stock certificate issue, as set forth in the corporation's stock ledger, was as follows: Certif-
Num-
Indicated
icate
ber of
Date of
No.
Shares
Issue
Stockholder
1
800
6-28-50
Aaron H. Ingram
2
450
6-28-50
William J. Wineberg
3
6
7-17-50
James A. Fuller
4
19
7-19-50
Aaron H. Ingram
5
225
7-19-50
William J. Wineberg
1,500
Petitioner contributed $45,000 to Yaquina Bay Mills, Inc., in the year 1950 in payment for the 450 shares of its stock represented by Certificate No. 2. Certificate No. 5 representing 225 shares of stock of Yaquina Bay Mills, Inc., for $22,500 was made out in the name of petitioner. No payment was made by petitioner on this stock in 1950, and the entire amount of the subscription price of $22,500 for Certificate No. 5 remained unpaid until June 13, 1951. Certificate No. 5, being unpaid, was not delivered to petitioner but was retained by Yaquina Bay Mills, Inc., in the possession of that corporation's attorney, Laurence Morley, until after payment of the subscription price of $22,500 *84 on or about June 13, 1951. On July 19, 1950, Certificate No. 1 for 800 shares of Yaquina Bay Mills, Inc., stock was cancelled and re-issued as follows: Certif-
icate
Number of
No.
Shares
New Stockholder
6
13
Laurence Morley
7
41
James A. Fuller
8
746
Aaron H. Ingram
800
In August 1950 Aaron H. Ingram was killed in an airplane crash. The First National Bank of Portland, Oregon and Laurence Morley of Lebanon, Oregon became executors of his estate. In January 1951 petitioner entered into negotiations with the estate of Aaron H. Ingram, Deceased, for the purchase of decedent's stock in Yaquina Bay Mills, Inc. On February 14, 1951, Certificate No. 3 for six shares of stock was cancelled and re-issued as follows: Certif-
icate
Number of
No.
Shares
New Stockholder
9
1
Thomas R. Chamber-
lin, Jr.
10
1
Ramon R. McQueen
11
4
James A. Fuller
On March 8, 1951, petitioner sold 375 shares and retained 75 shares of the 450 shares of Yaquina Bay Mills stock represented by Certificate No. 2. On the same day Certificate No. 2 for 450 shares was cancelled and re-issued as follows: Certif-
icate
Number of
No.
Shares
New Stockholder
12
375
George E. Miller
Lumber Co.
13
75
William J. Wineberg
450
*85 In March 1951, petitioner and the First National Bank of Portland, Oregon, executor of the Estate of Aaron H. Ingram, agreed on the sale of 825 shares of stock of Yaquina Bay Mills, Inc. by Ingram's Estate to petitioner for a consideration of $99,000 subject to the approval of the Probate Court. This agreement of sale involved the following certificates of stock: Certificate
Number of
No.
Shares
4
19
6
13
7
41
8
746
9
1
10
1
11
4
Total
825 The sale of the stock was approved by the Probate Court and carried out in April 1951 pursuant to order of the court and as provided therein payment was made by petitioner to the First National Bank, as executor, as follows: Check dated March 7, 1951
$10,000
Note dated March 14, 1951
66,800
Check dated April 11, 1951
22,200
Total
$99,000
For several months prior to May 1951, James E. Miller and his father, George E. Miller, operating as a partnership under the name of George E. Miller Lumber Company, had been negotiating with petitioner in an attempt to purchase all of the outstanding stock of Yaquina Bay Mills, Inc. There was no intention on the part of the partners of the George E. Miller *86 Lumber Company of distinguishing one share of stock from another, their interest being in acquiring all of the corporate stock if possible. The partners of George E. Miller Lumber Company considered the timber contract which Yaquina Bay Mills, Inc., had with petitioner to be the corporation's most valuable asset, and they realized that if they were to acquire all of the stock of Yaquina Bay Mills, Inc., they would have to acquire it on a basis acceptable to petitioner. George E. Miller Lumber Company was engaged in a wholesale lumber business. In addition to the 375 shares of stock sold by petitioner to George E. Miller Lumber Company in March 1951, which stock was re-issued to George E. Miller Lumber Company from Certificate No. 2, petitioner in May 1951 sold the following stock of Yaquina Bay Mills, Inc., to George E. Miller Lumber Company for a sales price of $172,500: Certificate
Number of
Date of
No.
Shares
Sale
Sales Price
5
225
May 1951
4, 6-11, inc.
675
May 1951
$172,500.00
13
75
May 1951
Following is a schedule showing the payments made by check by George E. Miller Lumber Company to petitioner or at his direction in payment of the purchase *87 price of the Yaquina Bay Mills, Inc., stock: Pay-
ment
Date
Payee
Amount
(1)
3- 1-51
Petitioner
$ 52,500
(2)
5-21-51
Petitioner
30,000
(3)
6-12-51
Yaquina Bay Mills,
Inc.
22,500
(4)
6-12-51
Petitioner
23,200
(5)
8- 6-51
William L. Payette
10,000
(6)
8- 6-51
Julius Newman
10,000
(7)
8- 6-51
Lester Johnston
10,000
(8)
12-31-51
First National Bank
of Portland
66,800
Total
$225,000 Check No. 3 listed above was paid direct to Yaquina Bay Mills, Inc., by George E. Miller Lumber Company at the direction of petitioner in payment of the unpaid balance owing by petitioner on his subscription to 225 shares of stock representing Certificate No. 5. Checks 5, 6, and 7 were paid at the direction of petitioner to vendors of the JPN mill which petitioner had purchased from the vendors. Check No. 8 was paid directly to the First National Bank of Portland, Oregon, in payment of the $66,800 note owing by petitioner as a result of his purchase of stock from the estate of Aaron H. Ingram. On July 5, 1951, the following certificates of stock of Yaquina Bay Mills, Inc., were cancelled: Certif-
icate
Number of
No.
Shares
Stockholder
4
19
Aaron H. Ingram
5
225
Petitioner
6
13
Laurence Morley
7
41
James A. Fuller
8
746
Aaron H. Ingram
9
1
Thomas R. Chamber-
lin, Jr.
10
1
Ramon R. McQueen
11
4
James A. Fuller
12
375
George E. Miller
Lumber Co.
13
75
Petitioner
1,500
*88 The above shares were re-issued on July 5, 1951, as follows: Certif-
icate
Number of
No.
Shares
Stockholder
14
75
Petitioner William J.
Wineberg
15
450
Cascadia Lumber Co.
16
450
Cascadia Lumber Co.
17
450
Cascadia Lumber Co.
18
75
Petitioner Janet
Wineberg
1,500
Cascadia Lumber Company which was owned by George E. Miller or the George E. Miller Lumber Company, was engaged in the business of lumber manufacturing. Sometime in June of 1951, about 1 month after the sale by petitioner in May 1951 of 975 shares of stock of Yaquina Bay Mills, Inc., to George E. Miller Lumber Company, a partnership, the petitioner as party of the first part and George E. Miller Lumber Company as party of the second part, signed an agreement reading, in part, as follows: That WHEREAS parties of the second part [George E. Miller Lumber Co.] have this day in writing offered to purchase of party of the first part [petitioner] nine hundred seventy-five (975) shares of the capital stock of the Yaquina Bay Mills, Inc.; and WHEREAS, party of the first part has accepted said offer of parties of the second part; and WHEREAS, there is now on deposit with *89 the First National Bank of Portland, Oregon seven hundred sixty-five (765) shares of the capital stock of Yaquina Bay Mills, Inc. which stock is held by said bank as security for a note signed by party of the first part in the principal amount of sixty-six thousand eight hundred ($66,800.00) dollars; and WHEREAS, it is agreed as a part of said purchase that parties of the second part shall assume said obligation of party of the first part at said First National Bank of Portland, Oregon and deliver said note to party of the first part; and WHEREAS, party of the first part has agreed to assign to parties of the second part all his right and interest in and to six hundred seventy-five (675) shares of said capital stock so deposited with said bank; NOW, THEREFORE, in consideration of the foregoing premises and of the mutual covenants and agreements hereinafter set forth it is agreed between the parties hereto as follows: 1. Party of the first part hereby authorizes and directs the First National Bank of Portland, Oregon, under its escrow agreement dated March 14, 1951, to deliver to parties of the second part, or to George E. Miller, said 765 shares of said capital stock now held *90 by the First National Bank of Portland, Oregon, under said escrow agreement upon payment to said bank of said principal sum of sixty-six thousand eight hundred ($66,800.00) dollars, together with accrued interest, or in the alternative upon parties of the second part, or George E. Miller making arrangements with said First National Bank of Portland, Oregon, for the discharge of said note and obligation of party of the first part. 2. Parties of the second part agree that upon receipt of said 765 shares of said stock to immediately thereafter deliver to party of the first part a certificate or certificates evidencing ninety (90) shares of said capital stock of the Yaquina Bay Mills, Inc. 3. Parties of the second part agree within ten (10) days from this date to take up said note of $66,800.00 and to deliver said note, together with certificate or certificates representing ninety (90) shares of the capital stock of the Yaquina Bay Mills, Inc. to party of the first part. The form of offer attached to the document hereinabove set forth, in part, provided: Mr. William J. Wineberg, Dear Mr. Wineberg: The undersigned hereby offers to purchase three hundred (300) shares of the capital *91 stock of the Yaquina Bay Mills, Inc. now owned by you and which is represented by certificates No. 5 for 225 shares and certificate No. 13 for 75 shares for the sum of one hundred one thousand five hundred ($101,500.00) dollars, payable as follows: (a) Twenty-two thousand five hundred ($22,500.00) dollars by check payable to you and which you are to endorse to the Yaquina Bay Mills, Inc. in payment of the balance due on your stock subscription. (b) Thirty thousand ($30,000.00) dollars by note executed by the undersigned to you payable on or before sixty (60) days from date. (c) Thirty thousand ($30,000.00) dollars by crediting you with that amount for moneys advanced to you on the purchase price of mill near Waldport, Oregon. (d) Nineteen thousand ($19,000.00) dollars in cash. The payments to be made as above indicated upon your delivering to the undersigned stock certificates properly endorsed representing said 300 shares of stock and the payment of the required transfer stamp taxes. We also offer to purchase from you six hundred seventy-five (675) shares of the capital stock of the Yaquina Bay Mills, Inc., the certificate for which stock is now escrowed with the First *92 National Bank of Portland, Oregon. We agree to pay for said 675 shares of stock the total sum of $71,000,00 payable as follows: (a) We are to assume the note which you have executed to Lawrence Morley and the First National Bank of Portland, executors of the estate of Aaron H. Ingram, deceased, said note being in the principal amount of $66,800.00, with accrued interest at four per cent. It is understood that we are to either substitute our own note for this obligation or pay your note so that as a part of this transaction the note will be returned to you. (b) The balance [of] $4200.00 to be paid in cash. It is understood that whatever transfer taxes are required will be paid by you. It is understood that there is a total of 765 shares of stock of Yaquina Bay Mills, Inc. hypothecated as security for your loan and we agree when your note is paid off to deliver to you a certificate for whatever number of shares there may be so deposited over and above 675 shares which you are selling to us. Unless this offer is accepted by you within ten (10) days from this date it will be considered withdrawn. Very truly yours, George E. Miller Lumber Co. By (Signed) Geo. E. Miller, *93 Managing Partner I hereby accept the above offer. (Signed) Wm. J. Wineberg Petitioners, on their income tax return for 1951, reported a long-term capital gain of $80,722.25 from the sale of Yaquina Bay Mills stock, computed as follows: Date
Date
Sales
Gain or
Acquired
Sold
Price
Cost
(Loss)
6-50
3-51
$ 52,500.00
$ 33,333.75
$19,166.25
6-50
5-51
172,500.00
110,944.00
61,556.00
$225,000.00
$144,277.75
$80,722.25
Respondent, in the notice of deficiency, made no changes in the method by which and amount in which petitioners reported the capital gain from the sale of the Yaquina Bay Mills stock. Respondent, in his amended answer, affirmatively alleged that petitioners' sale of Yaquina Bay Mills stock resulted in long-term capital gain of $45,922.75 and short-term capital gain of $55,577.25 computed as follows: No. of
Cost
Date
Sale
Long-term
Short-term
Shares
Acquired
Basis
Sold
Price
Capital Gain
Capital Gain
375
6-50
$ 16,665.00
3-51
$ 52,500.00
$ 35,835.00
75
6-50
3,335.00
5-51
13,422.75
10,087.75
225
1-51
22,500.00
5-51
40,268.25
$17,768.25
675
3-51
81,000.00
5-51
118,809.00
37,809.00
1,350
$123,500.00
$225,000.00
$ 45,922.75
$55,577.25
Taxable portion of above gains (50%)
$ 22,961.37
$55,577.25
Taxable gains reported in return
40,361.12
0
Increase or (decrease) in capital
[17,399.75)
$55,577.25
gains reported
*94 and that hence the petitioners understated taxable income in the amount of $38,177.50, computed as follows: Short-term capital gains not
reported (see above)
$55,577.25
Decrease in capital gains re-
ported (see above)
17,399.75
Understatement
$38,177.50
b. Deduction Taken for Charitable Contributions Petitioners, on their income tax return for 1953, claimed a deduction of $5,000 as a charitable contribution to the Sacred Heart Church at Newport, Oregon, based upon the $5,000 check dated January 8, 1953, drawn by petitioner to the Sacred Heart Church and delivered to Rodakowski under the circumstances heretofore set forth in connection with the sale by petitioner to Pritzlaff and Wilson of the Fox Valley tract. Petitioner was not a member of the Sacred Heart Church at Newport, Oregon and did not attend services there. Respondent, in his amended answer, affirmatively alleged that the $5,000 paid by check of the petitioner dated January 8, 1953, in favor of the Sacred Heart Church was not a charitable contribution to the Catholic church as shown by petitioners on their income tax return for 1953 but a nondeductible capital expenditure by petitioner for *95 purchase of the land in the Maesfrancx tract from the Archdiocese of Portland in Oregon. c. Profits from Joint Venture between Petitioner and Walter S. Hilberg During the taxable years here involved petitioner was associated with Walter S. Hilberg in a loose business arrangement or joint venture based on some mutual understanding between the two. The association between petitioner and Hilberg commenced in 1936, continued throughout the ensuing years, and was still in effect in 1957. The association between petitioner and Hilberg was formed for the purpose of buying and selling timber, timberlands, and other real property located in the State of Washington. The method of operation followed by petitioner and Hilberg in their association was to buy properties at distressed prices and to sell them later at a profit. Both petitioner and Hillberg participated in the acquisition of properties. In some instances the property acquired jointly by petitioner and Hilberg would be taken in Hilberg's name only, and in some instances, in petitioner's name only. Whenever a sale was made of any of the property, petitioner and Hillberg would agree on the price which would be taken for the property. *96 Hilberg would be interested in selling property at times when petitioner was not interested. In such cases, it was decided that Hilberg would take all the money received from the sale of a certain piece of property and petitioner would take another piece of property instead of any of the money from the sale of the piece being sold. Hilberg kept a record of the properties he sold, and he would report the entire gross amount received from the sale of the property on his income tax return for the year in which the property was sold and deduct his cost of the property sold. He did not deduct any of the costs of property which had been paid by petitioner. On some pieces of property Hilberg carried all the costs and on others petitioner did. Hilberg kept a record of the transactions that he had in association with petitioner. Hilberg's records showed the following sales of timber and other real estate made during the years 1950 to 1953 and the allocation he made of the proceeds between himself and petitioner. Amount Due to
Net Sale
Year
Receipts
Hilberg
Petitioner
of Sale
Timber to Joe Staley
$ 8,033.34
$ 4,016.67
$ 4,016.67
1950
8 1/2 acres to Camas
475.00
237.50
237.50
1950
Lot in Vancouver
477.40
0
477.40
1950
Kelso Smelting Co. receipt (1/3)
50.00
33.34
16.66
1950
Logs to Schumaker Logging Co.
875.04
583.36
291.68
1950
(1/3)
Timber to Wagner Bros. Lbr. Co.
8,000.00
6,550.00
1,450.00
1951
Timber to Peninsula Plywood Co.
14,666.05
7,333.02
7,333.03
1952
Lots 17 & 18 - Port Angeles
390.63
195.32
195.31
1953
Lots 1 to 4 - Port Angeles
341.50
170.75
170.75
1953
Lot 23, Kingston Home Tracts
231.00
115.50
115.50
1953
Timber to Joe Wills
1,157.49
578.74
578.75
1953
Total
$34,697.45
$19,814.20
$14,883.25
*97 Hilberg's records set forth sales for the years 1950 through 1957 in which a total of $32,781.29 was shown as the portion of the net sales due to petitioner. Hilberg's records showed the following properties transferred by him to petitioner during the years 1951 to 1957, inclusive. Property Transferred to
Amount
1952
1951 & 1953
1954-1957
Petitioner
1/2 interest in certain property
$ 2,500.00
$2,500.00
Amount paid on California
355.55
355.55
contract
Interest in surplus stoves
362.00
362.00
1/2 int. in Clallum Co. Wash.
250.00
250.00
contract
Interest in logging trucks
3,000.00
3,000.00
Int. in amount due on Lewis
165.00
165.00
trespass
1/16 int. in Penn. Plywood deal
125.00
125.00
Cozy Court contract receivable
1,610.00
$1,610.00
Int. in 320 acres Skamania Co.
3,500.00
3,500.00
Wash.
Int. in LaBerg Court, Vancouver,
8,153.43
8,153.43
Wash.
Int. in Jefferson Co., Wash.
212.52
212.52
contract
Int. in Jefferson Co., Wash.
204.40
204.40
contract
Int. in Jefferson Co., Wash.
24.00
24.00
contract
Int. in Cowlitz Co., Wash.
100.00
100.00
property
Int. in 3 lots in Oil City,
30.00
30.00
Wash.
Int. in Cowlitz Co., Wash. land
500.00
500.00
Int. in Cowlitz Co., Wash. land
500.00
500.00
Int. in Cowlitz Co., Wash. land
1,375.00
1,375.00
Int. in contract, Jefferson Co.,
1,750.00
1,750.00
Wash.
Int. in 7 1/2 acres, Clark Co.,
1,000.00
1,000.00
Wash.
Int. in 40 acres, Lewis Co.,
347.64
347.64
Wash.
Int. in 80 acres, Pacific Co.,
2,500.00
2,500.00
Wash.
Int. in 140 acres, Skamania Co.,
1,216.75
1,216.75
Wash.
Int. in 260 acres, Skamania Co.,
1,000.00
1,000.00
Wash.
Int. in 40 acres, Klickitat Co.,
500.00
500.00
Wash.
Int. in 40 acres, Clark Co.,
1,000.00
1,000.00
Wash.
Int. in 158.64 acres, Clark Co.,
500.00
500.00
Wash.
Total payments made in form of
$32,781.29
$6,757.55
0
$26,023.74
property transfers
*98 It was always the practice of Hilberg to account to petitioner for the portions of the profit that Hilberg showed on the records he kept by transferring his interest in other properties to petitioner. Petitioner did not report, on his income tax returns for the years 1950, 1951, 1952, and 1953, the amounts allocated on Hilberg's records as amounts due to him from the sale of properties jointly owned with Hilberg. In the deficiency notice respondent made no addition to petitioners' income from profits from the association of petitioner with Hilberg but in his amended answer alleged that petitioners failed to report on their income tax returns for the years 1950 through 1953, or otherwise to include in taxable income, their distributable share of the profits realized by the joint venture of petitioner and Hilberg as follows: 1950
$ 5,039.91
1951
1,450.00
1952
7,333.03
1953
1,060.31
Total
$14,883.25
d. Sales of Timber, Logs, and Lumber to Yaquina Bay Mills, Inc. During the taxable years here involved Yaquina Bay Mills, Inc., operated what is generally known as a remanufacturing plant in which it planed, trimmed, and resawed logs and rough timber into *99 finished lumber products. After 1951 and throughout the remaining years here involved, George E. Miller Lumber Company or Cascadia Lumber Company, a corporation, owned all of the stock of Yaquina Bay Mills, Inc., except for 150 shares belonging to petitioner. George E. Miller Lumber Company, a partnership, and Cascadia Lumber Company were engaged in the respective businesses of selling lumber at wholesale and manufacturing lumber. These businesses were interrelated and were owned, managed, and controlled by George E. Miller and his son, James E. Miller, during the taxable years here involved. During the taxable years 1951, 1952, and 1953, petitioner sold timber owned by him to Cascadia Lumber Company and Yaquina Bay Mills, Inc., and to other persons who in turn cut, sold and delivered timber to Yaquina Bay Mills, Inc., in the form of logs or rough lumber in accordance with agreements between petitioner and Cascadia Lumber Company and Yaquina Bay Mills, Inc., entered into on July 5, 1951, portions of which have been set forth in connection with the issue of production royalties. The other persons to whom petitioner sold timber which was delivered to Yaquina Bay Mills, Inc., in the *100 form of logs or rough lumber included James E. Wilson, Geil and Van Handel, Hokanson, P & W Mill, Sweet Bros., Duke Ross, Davis, Kittle, Robenette, Howard Gates, E. C. High, Leonard Miller, Scott Creek, Christiansen, Penter, Alcorn, and Boom Stick Towing. These persons represented either contract or "captive" mill owners under instructions by petitioner to cut, saw, and deliver rough lumber to Yaquina Bay Mills, Inc., and loggers employed by petitioner, Cascadia Lumber Company or Yaquina Bay Mills, Inc., to log petitioner's timber and to deliver the rough lumber to Yaquina Bay Mills, Inc. The amounts due to petitioner from timber cut and removed from petitioner's land by the contract or "captive" mill owners and delivered to Yaquina Bay Mills, Inc., under the circumstances heretofore recited were credited to the account of petitioner on the books and records of Yaquina Bay Mills, Inc. The account payable to petitioner reflected credits to his account for timber or logs received. The records of Yaquina Bay Mills, Inc., also reflected various payments to petitioner or to other persons in payment of petitioner's obligations to such persons and such payments were charged against petitioner's *101 account on Yaquina Bay Mills' books. Wherever payments were made on behalf of petitioner by Yaquina Bay Mills, Inc., such payments were made at petitioner's direction. These creditors of petitioner primarily were persons who had transferred timber or timberland to petitioner. The transactions involving the delivery of logs to Yaquina Bay Mills, Inc., were concluded between petitioner and Yaquina Bay Mills, Inc., in April 1954 at which time the credit balance remaining in petitioner's account was paid. Petitioner's account on the books of Yaquina Bay Mills, Inc., was credited with amounts due petitioner from the sale of petitioner's timber in the years 1951, 1952, 1953, and 1954 in the total amounts of $56,557.02, $41,751.78, $38,352.07, and $15,773.45, respectively. The total payments to or on behalf of petitioner charged against petitioner's account on the books of Yaquina Bay Mills, Inc., for the years 1951, 1952, 1953, and 1954, were in the amounts of $40,250.00, $28,330.34, $34,421.74, and $49,432.24, respectively, made up of the following items: Item
Amount
1951
Payments made by George E. Miller
Lumber Company on Real Estate
acquired by petitioner in 1951: Sherman Hendrickson
$ 7,000.00
W. A. Osborn
10,500.00
D. F. Shanahan
$ 2,500.00
W. P. Landis
3,750.00
Check to Forestry Service 7-1-51
1,500.00
Check to Leonard & Lakin 11-5-51
15,000.00
Total payments - 1951
$40,250.00
1952
Payment of George E. Miller Lumber
Company to Leonard and Lakin on
1-31-52
$15,225.00
Check to H. V. Johnson 4-30-52
1,000.00
Check of George E. Miller Lbr. Co.
6-11-52
1,000.00
Check to H. V. Johnson 6-3-52
5,000.00
Lumber to Wineberg 6-30-52
210.00
Lumber to Wineberg 7-1-52
130.70
Payment by George E. Miller Lum-
ber Company - Cedar Creek Wind-
fall 8-13-52
3,302.78
Check of George E. Miller Lumber
Company - 8-30-52
1,000.00
Lumber to Wineberg 9-30-52
125.41
Overrun on Cedar Creek Windfall
12-29-52
1,233.25
Lumber to Wineberg 12-31-52
103.20
Total payments - 1952
$28,330.34
1953
Dock charge paid for Wineberg 3-31-53
$ 8.00
Check of 1-29-53
6,880.70
Check of 2-14-53
5,000.00
Lumber to Wineberg 2-28-53
102.74
Lumber to Wineberg 4-30-53
645.72
Check of 5-29-53
3,167.78
Check of 6-10-53
1,360.88
Check of 7-7-53
2,282.59
Check of 7-8-53
1,558.54
Check of 9-17-53
2,933.53
Check of 9-18-53
961.52
George E. Miller Lumber Company
Check 11-30-53
3,000.00
Lumber to Wineberg 6-30-53
399.64
Lumber to Wineberg 7-31-53
315.47
Spaulding Pulp & Paper Company
payment 9-30-53
1,916.26
Check of 11-13-53
1,019.62
Check of 12-10-53
1,706.47
Check of 12-10-53
1,162.28
Total payments - 1953
$34,421.74
1954
Check of 1-15-54
$ 6,764.95
Check of 2-11-54
54.88
Payment of George E. Miller Lum-
ber Co. 4-30-54
222.95
Check of Lincoln Lumber Sales to
Wineberg 2-11-54
42,389.46
Total payments - 1954
$49,432.24
*102 As of December 31, 1953, there was a credit balance in petitioner's account on the books of Yaquina Bay Mills, Inc., of $33,658.79. The cash position of Yaquina Bay Mills, Inc., during most of the period from July 1, 1951 through July 1, 1953, was somewhat poor and for a short period of time around July 30, 1953, the current liabilities of Yaquina Bay Mills, Inc., exceeded its current assets. As of June 30, 1953, Yaquina Bay Mills, Inc., had accounts receivable approximating $120,000 which were liquidated during a period of 3 or 4 months thereafter and during this 3- or 4-month period certain trade accounts of Yaquina Bay Mills, Inc., accepted partial payment. There were times during the years 1951, 1952, and 1953 when petitioner would request payment from his credit account from Yaquina Bay Mills, Inc., and be told that there was not then cash available for such payment, but generally the credit balance in petitioner's account was available to him had he requested payment thereof. Petitioner was furnished regular statements respecting the status of his account with Yaquina Bay Mills, Inc., and he checked the account periodically. Petitioners, on their income tax returns for *103 the years 1951 through 1954 reported receipts from timber sold, logged and delivered to Yaquina Bay Mills, Inc., partially as capital gains and partially as ordinary income as follows: 1951
1952
1953
1954
Total
Amounts reported as
$10,750.00
$ 9,301.98
$10,649.07
$47,256.43
$77,957.48
long-term capital gain
Less costs claimed
70.00
30,596.00
30,666.00
Net capital gains
$10,750.00
$ 9,301.98
$10,579.07
$16,660.43
$47,291.48
reported (100%)
Amounts reported as
$ 823.20
$ 963.44
$ 6,890.56
$ 2,772.04
$11,449.24
ordinary income
Respondent made no change in his notice of deficiency in the amounts reported by petitioner with respect to petitioner's receipts from Yaquina Bay Mills, Inc. In his amended answer respondent alleged that petitioner's income was understated by the amounts of $24,606.61, $23,267.61 and $18,615.73 in the years 1951, 1952 and 1953, respectively, representing sales of timber, logs and lumber to Yaquina Bay Mills, Inc. This amount was computed by respondent as follows: 1951
1952
1953
Total credits to petitioner's account
$56,557.02
$41,751.78
$38,352.07
Less collections on two mill contracts
18,195.96
5,313.49
Gross receipts from timber sales
$38,361.06
$36,438.29
$38,352.07
Less costs spread equally over years
7,556.25
7,556.25
7,556.25
Net proceeds from timber sales
$30,804.81
$28,882.04
$30,795.82
Amounts received
$30,804.81
$28,882.04
$30,795.82
Amounts reported as ordinary income and
11,573.20
10,265.42
17,469.63
capital gains (100%)
Amounts unreported
$19,231.61 *
$18,616.62
$13,326.19
Amounts received
$30,804.81
$28,882.04
$30,795.82
Amounts reported as ordinary income and
portion of capital gains
(50%) included in taxable income
$ 6,198.20
$ 5,614.43
$12,180.09
Taxable income understated
$24,606.61 *
$23,267.61
$18,615.73
*104 1954
Total
Total credits to petitioner's account
$15,773.45
$152,434.32
Less collections on two mill contracts
23,509.45
Gross receipts from timber sales
$15,773.45
$128,924.87
Less costs spread equally over years
7,556.25
30,225.00
Net proceeds from timber sales
$ 8,217.20
$98,699.87
Amounts received
$ 8,217.20
$98,699.87
Amounts reported as ordinary income and
19,432.50
58,740.75
capital gains (100%)
Amounts unreported
($11,215.30)
$39,959.12
Amounts received
Amounts reported as ordinary income and
portion of capital gains
(50%) included in taxable income
Taxable income understated
e. Timber Sales to Canyon Logging Company, Geil and Van Handel Lumber Company, and George E. Miller Lumber Company In 1951 petitioner sold certain timber to George E. Miller Lumber Company for a total price of $7,000. George E. Miller Lumber Company paid for the timber on July 7, 1951, in the following manner: George E. Miller Lumber Company issued its check dated July 7, 1951, in *105 the amount of $7,000 to F. P. Stager of Taft, Oregon. Stager received the check as attorney for Earl C. Williams of Delake, Oregon, deposited the check in his bank account on July 7, 1951, and issued his personal check in the same amount to Williams. On July 17, 1951, Williams conveyed certain timberlands located in Lincoln County, Oregon to petitioner. Petitioner did not include the amount of $7,000 paid to him as above described on his income tax return for the year 1951. Respondent did not increase petitioner's income as determined in the notice of deficiency by the $7,000 payment as above described. Respondent in his amended answer alleged that petitioner's income should be increased by the amount of $7,000 as receipts from sales of timber to George E. Miller Lumber Company in the year 1951. In November 1952, Gus Fernandez of Kelso, Washington, acquired three adjoining tracts of timberlands in Clark County, Washington from A. D. Smith for $1,000; from Milton W. Coleman for $3,000; and from M. E. Milton for $1,500. Deeds to these tracts made out to Gus Fernandez were deposited in escrow with Reliance Title and Abstract Co., Kelso, Washington. On December 23, 1952. Gus Fernandez *106 placed a deed conveying title to these properties to petitioner with an escrow agent, Reliance Title and Abstract Co. The total sales price to be received by Fernandez for these properties was $9,000. Payment of the $9,000 to Reliance Title and Abstract Co. was made by check for $7,000 payable to that company dated February 26, 1953, signed by Ercill Wilson, and a check for $2,000 payable to Reliance Title and Abstract Co., dated February 2, 1953, drawn on the account of Geil & Van Handel Lumber Company of Kernville, Oregon. In late 1952 or early 1953 Pritzlaff and Wilson commenced negotiations with petitioner for the purchase of timber on lands owned by petitioner in Linn County, Oregon, sometimes referred to as the Linn County tract and sometimes as the Berlin tract. During these negotiations Pritzlaff, who was negotiating on behalf of himself and Wilson, discussed the purchase of the timber for cash. An agreement entered into between petitioner and Pritzlaff and Wilson doing business as Canyon Logging Company, dated March 11, 1953, provided in part as follows: THAT, WHEREAS, the parties of the first part [petitioners William J. Wineberg and Janet R. Wineberg] are the owners *107 of the following described real property located in Linn County, Oregon, to-wit: Southeast quarter of the Southwest quarter of Section 1, Township 13 S., Range 1 West of the W.M. [also known as the Berlin tract] together with the timber thereon, which property will hereinafter be referred to as the Linn County property; and WHEREAS, the parties of the second part [Pritzlaff and Wilson] are acquiring by purchase the following real property in CLARKE County, Washington, to-wit: [Description of Clarke County Property follows] which property will hereinafter be referred to as the Clarke County property; and WHEREAS, the parties of the second part are desirous of exchanging the said Clarke County property for the merchantable timber as hereinafter defined located upon the Linn County property; and WHEREAS, parties of the first part are willing to make said exchange upon the terms and conditions hereinafter set forth; NOW, THEREFORE, in consideration of the foregoing premises and of the mutual covenants and agreements hereinafter set forth it is agreed between the parties hereto as follows: 1. Parties of the first part hereby bargain, sell and transfer to parties *108 of the second part all the merchantable timber located and being upon the Linn County property. Provided, however, that any trees measuring less than sixteen inches, breast high, shall not be deemed to be merchantable timber and are not included in this contract. 2. In exchange and payment for said timber upon the Linn County property [Berlin tract] parties of the second part agree to convey, or cause to be conveyed to parties of the first part the Clarke County property. Said conveyance to be by warranty deed free and clear of all encumbrances. On this agreement the typewritten date, February 1953 is shown, and a line drawn through the typewritten "February" and the handwritten word "March" placed there above. The check issued by Wilson to Reliance Title and Abstract Company dated February 26, 1953, was in payment for the timber on the Linn County or Berlin tract and Wilson issued the check to the Reliance Title and Abstract Company pursuant to the directions of petitioner or his attorney. When the check of February 26, 1953, was drawn, it was understood that it would be held by petitioner's attorney pending the drafting of an agreement of sale to be executed by the parties *109 and that if the agreement of sale were not executed the check would be returned. The agreement of sale was with respect to the timber on the Linn County or Berlin tract for which the $7,000 represented the purchase price. Neither Pritzlaff nor Wilson ever entered [into] negotiations with Fernandez for the purchase of the Clarke County properties. The warranty deed conveying title of the three tracts of timberland in Clarke County, Washington to petitioner bears the date of December 23, 1952, and is notarized under date of March 25, 1953. On their income tax return for 1953 petitioners did not include in their income as reported the $7,000 paid by Ercill Wilson to Reliance Title and Abstract Co. or the $2,000 paid by Geil & Van Handel Lumber Company to Reliance Title and Abstract Co. Respondent in his notice of deficiency did not include these amounts in petitioners' taxable income but in his amended answer alleged that petitioners' income for the year 1953 was understated in the amount of $9,000 representing receipts from timber sales to Pritzlaff and Wilson and Geil & Van Handel Lumber Company. Issue 7. Fraud Petitioners' income tax returns for each of the years here *110 involved were prepared by the accounting firm of Jay R. Wilson & Co., the returns for the years 1950, 1951, and 1952 being prepared personally by Jay R. Wilson, and the return for 1953, by Jack L. Medlar. Petitioner employed accountants in connection with the keeping of his books, and petitioner left to his accountants who were preparing his income tax returns the determination of what items should be reported as capital gains and what items should be considered ordinary income. Other facts bearing on this issue have been set forth in connection with the sale of petitioner's Yaquina Bay Mills, Inc., stock, the other alleged items of unreported income as set forth by respondent in his amended answer and in connection with the purchase of timber from Rodakowski. Respondent made no determination in his notice of deficiency that there was any addition to the tax due from petitioner under section 293(b) of the Internal Revenue Code of 1939 or that any portions of the deficiencies as determined by him were due to fraud with intent to evade the payment of tax. The deficiency notice was the result of an investigation made by a revenue agent named Larry Ellson. Subsequently, another revenue *111 agent, Perry DeMasters, was investigating petitioners' income tax returns for 1954 and subsequent years. In connection therewith, DeMasters reviewed certain transactions of petitioners for the years 1950, 1951, 1952, and 1953 and concluded that petitioner had unreported income for each of these years. Respondent, by amended answer, affirmatively alleged that the deficiencies in income tax as determined in the notice of deficiency and the increased deficiencies in income tax claimed by him in his amended answer for the taxable years 1950 to 1953, inclusive, were due in whole or in part to fraud with intent to evade tax and claimed additions to the tax under the provisions of section 293(b) of the Internal Revenue Code of 1939 for each of the years 1950, 1951, 1952, and 1953. Opinion Issue 1. Whether Profits from Certain Sales and Exchanges Were Ordinary Income. a. Profit from Timber Sales The first issue is whether the gain realized by petitioner on the sale of certain timber during the taxable years here involved is taxable as capital gain or ordinary income. Section 117(a)(1) of the Internal Revenue Code of 1939[4] defines a capital asset as property held by the taxpayer *112 with exceptions therein set forth. One such exception is property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. Respondent contends that petitioner was, during the taxable years here involved, engaged in the trade or business of selling timber and timberlands and that his sales of timber in each of the taxable years come within this exception. Petitioner denies that he was engaged in the trade or business of selling timber and timberlands during the years here involved and further contends that even if he is considered to be engaged in such a trade or business, the timber sold by him during these years was not held by him primarily for sale to customers in the ordinary course of such trade or business. *113 What constitutes a trade or business is a question of fact. Many factors have been considered by the courts in the determination of this question, among them, the nature of the acquisition of the property, the frequency and continuity of transactions over a period of time as distinguished from isolated transactions, substantiality of transactions, and the activity of the seller with respect to the property. William E. Starke, 35 T.C. 18, 26 (1960) and cases there cited, on appeal (C.A. 9, Jan. 19, 1961). Considering all the evidence herein and particularly the numerous sales made by petitioner, the high percentage of his total income derived from such sales, his own participation in the sales activity, and the lack of any other occupation which consumed a substantial portion of his working time, all as set forth in some detail in our findings, we hold that petitioner was engaged in the trade or business of selling timber during the taxable years here involved. Since none of the adjustments made by respondent involves sales of timberlands, it is unnecessary to pass on the question whether sales of timberlands were also a part of petitioner's trade or business in the *114 years here involved. Petitioner argues that even if he is considered to be engaged in the trade or business of selling timber and timberlands, the sales made during the years here involved and reported as sales of capital assets were of property held by him for the purpose of investment and speculation, calling attention to the fact that it has been recognized that a dealer may also be an investor. Nelson A. Farry, 13 T.C. 8 (1949). Petitioner, in support of his contention that his timber and timberlands were held by him primarily for investment purposes, stresses the fact that he did not advertise such timber and timberlands for sale during the taxable years here involved. This is of little significance under the circumstances of the instant case. The evidence is clear that petitioner had means available for selling his timber without placing advertisements in newspapers and on sign boards. He operated under the trade name of Wineberg Timber Company with a regular staff of employees in the county in which he had the most substantial holdings of timber and timberlands and it was well known to persons engaged in the type of businesses in that area requiring purchases *115 of timber that the Wineberg Timber Company had timber for sale. Petitioner also had agents other than the employees of Wineberg Timber Company, who brought to him offers from prospective customers to purchase timber. He had a contract granting options to purchase his timber to a sawmill. These facts indicate that petitioner used affirmative means of selling his timber which proved effective. Under these circumstances, whether the method of selling used by petitioner could be denominated a form of advertising is of little significance. Cf. Real Estate Corporation, 35 T.C. 610, 614 (1961), on appeal (C.A. 10, July 24, 1961), and C. E. Mauldin, 16 T.C. 698, 711 (1951), affd. 195 F. 2d 714 (C.A. 10, 1952). There is no affirmative evidence with respect to any property which petitioner sold during the taxable years here involved to show that petitioner held it for some specific reason as an investment. The fact that petitioner followed a practice of selling the timber and retaining the timberland is some indication that some of his timberlands might have been held for investment, but the evidence does not show such to be the case as to any of the *116 timber sales in the years here involved. There is no evidence of any particular instances in which petitioner refused to sell a property or treated one property as being in a class or category different from his other properties. The only evidence in this connection offered by petitioner was the testimony of petitioner, himself, that he acquired all the various properties held by him for investment purposes and that he owned some properties that he would be unwilling to sell at any price. Petitioner's actions in selling numerous tracts of timber in the years here involved indicate that his idea of holding his properties for investment is holding them for resale when he can find a customer willing to pay a price that he is willing to accept for the properties. This is not holding of property for investment. Curtis Co., 23 T.C. 740, 755 (1955), reversed on another issue, 232 F. 2d 167, (C.A. 3, 1956). Petitioner also points to the length of time during which he had held some of the timberlands from which the timber was sold during the taxable years here involved as indicating that such properties were held by him for investment. It may be that some of the properties *117 were originally acquired by petitioner for investment purposes, though the evidence, even in this regard, is not persuasive but the ultimate question is the purpose for which the property was held at the time of sale. Palos Verdes Corp. v. United States, 201 F. 2d 256 (C.A. 9, 1952). We sustain respondent's determination that petitioner's sales of timber in the taxable years here involved were sales of property held by petitioner primarily for sale to customers in the ordinary course of his trade or business and we sustain respondent's determination in his notice of deficiency that the gain from such timber sales is taxable as ordinary income except to the extent specifically permitted to be taxed as capital gains under section 117(k) of the Internal Revenue Code of 1939. Since petitioner treated the amounts received from trespass cuttings of his timber to be received in lieu of payment for the timber, itself, such amounts were likewise received by petitioner from the sale of properties held primarily for sale to customers in the ordinary course of his trade or business and the gain therefrom constitutes ordinary income. b. Profit from Property Exchanges Section *118 112(b)(1) of the Internal Revenue Code of 1939[5] provides that no gain or loss shall be recognized if property held for productive use in a trade or business or for investment purposes, is exchanged solely for property of a like kind to be held either for productive use in a trade or business or for investment purposes. Petitioners contend that this provision of the Internal Revenue Code of 1939 is applicable to their transaction in 1950 with A. L. MacInnis and Cosima D. MacInnis doing business as Wrenn Planing Mill, their transactions in 1950 and 1951 with the Monroe Lumber Company, their transaction in 1952 with the Springfield Plywood Corporation, and *119 their transactions in 1953 with Pritzlaff and Wilson. Respondent in support of his determination contends that these transactions did not constitute exchanges of properties at all but constituted outright sales of timber, a portion of the purchase price in each instance being discharged by the purchaser, at petitioner's direction, paying directly to a third party, from whom petitioner had agreed to purchase other property, the agreed price of such other property. Respondent further contends that even if the transactions were in fact partial exchanges of properties, the properties exchanged were not like properties within the meaning of section 112(b)(1) of the Internal Revenue Code of 1939. The parties do not specifically argue under this issue the question of whether the properties claimed by petitioner to have been exchanged for like properties were held by petitioner for productive use in his trade or business or for investment. There is nothing in the record to support a contention that the properties transferred by petitioner in these transactions were held for productive use in his trade or business. The property transferred in each instance was standing timber. While some *120 argument might be made that some of petitioner's timberlands were held for productive use under a reforestation program, such an argument is not applicable to mature timber. We have held that petitioner's timber in each of the years here involved was held by him primarily for sale to customers in the ordinary course of his trade or business and not for investment. Therefore, since the property transferred by petitioner was not held by him for productive use in his trade or business or for investment, the transactions result in recognizable gains. Cf. Regals Realty Co. v. Commissioner, 127 F. 2d 931 (C.A. 2, 1942), affirming 43 B.T.A. 194 (1940). It is, therefore, unnecessary to pass upon other contentions made by respondent. We sustain respondent's determination with respect to each of the claimed exchanges. Issues 2 and 3. Disposition of Timber in Which Petitioners Claimed to Have Retained an Economic Interest and Production Royalties as Capital Gain Petitioners contend in the alternative that if it is considered that the sale to J. L. Ledgett on November 10, 1952, and the proceeds from the cutting of the Kendall timber by Monroe Lumber Company were *121 sales of property held by petitioner for sale to customers in the ordinary course of his trade or business, then these sales were entitled to the treatment given to gains from the sale or exchange of capital assets since they conform to the requirements of section 117(k)(2) of the Internal Revenue Code of 1939[6] respecting the sale of timber with the retention of an economic interest. The petitioner makes the same contention with respect to the amounts reported by him as ordinary income from production royalties received from Yaquina Bay Mills, Inc., and Cascadia Lumber Company. [7]
*122 It is respondent's contention that none of these sales comes within the provision of section 117(k)(2) of the Internal Revenue Code of 1939 for various reasons which will be separately discussed with respect to the various transactions. With respect to the sale to J. L. Ledgett, respondent contends that this constituted an outright sale of timber with a deferred payment. The contract with Ledgett, the pertinent parts of which are set forth in our findings, provides that the seller agrees to sell and the buyer agrees to purchase all of the merchantable timber located on the described tract (the definition of merchantable timber being contained in the contract), and that the buyer agrees to pay the seller for such timber the sum of $30,000, payable $5,000 upon execution of the contract, $5,000 upon the day the buyer begins logging, and the balance of $20,000 plus interest at 6 percent per annum on all deferred payments at $20 per thousand feet for all saw logs developed and removed from the tract and $35 per thousand feet on all peeler logs developed and removed from the tract. The contract provided for payment between the first and tenth of each month and placed a time limit within *123 which the timber must be removed. Petitioner later agreed for Ledgett to pay the remaining $20,000 as he sold the logs. Petitioner was the owner of the property and timber thereon which was sold to Ledgett and had held this property for more than 6 months, thus meeting that portion of the requirements of section 117(k)(2) of the Internal Revenue Code of 1939. The contract between petitioner and Ledgett was clearly a disposal of the timber, thus leaving for decision only the question of whether the sale by petitioner was one wherein he retained an economic interest in the timber. For a seller to retain an economic interest in timber, he must derive income from the severance and sale of the timber, to which he must look for the return of his investment. Estate of James M. Lawton, 33 T.C. 47, 53 (1959). In Palmer v. Bender, 287 U.S. 551 (1932), the retention of an economic interest in oil sufficient to permit an allowance for depletion was stated to exist in "every case in which the taxpayer had acquired, by investment, any interest in the oil in place, and secures, by any form of legal relationship, income derived from the extraction of the oil, to which *124 he must look for a return of his capital." Numerous cases decided since Palmer v. Bender, supra, have dealt with the question whether under a particular agreement the taxpayer involved had retained an economic interest in a natural resource. Commissioner v. Southwest Exploration Co., 350 U.S. 308 (1956); Estate of James M. Lawton, supra, Robert M. Dann, 30 T.C. 499 (1958), appeal dismissed (C.A. 2, 1959); Charles H. Remer, 28 T.C. 85, 92 (1957), affd. 260 F. 2d 337 (C.A. 8, 1958); O. H. Kittle, 21 T.C. 79 (1953), affirmed per curiam 229 F. 2d 313 (C.A. 9, 1956). In Estate of James M. Lawton, supra, which involved a sale of timber, we stated that the principles established in determining whether a taxpayer had a "retained economic interest" in other natural resources had been applied in making the necessary determination under section 117(k)(2) of the Internal Revenue Code of 1939. The question involved in Robert M. Dann, supra, was whether a certain contract for fill dirt constituted a completed sale of property, the gain from which constituted capital *125 gain or was in effect a mineral lease, the receipts from which constituted ordinary income after deduction of a depletion allowance. In that case the taxpayer was entitled to the benefits of the capital gains provision if he could show that under the agreement there involved he had not retained an economic interest in the natural resource, whereas petitioner in the instant case comes within the provisions of section 117(k)(2) of the Internal Revenue Code of 1939 only if he can show that he has retained an economic interest in the timber. In Robert M. Dann, supra, we stated at page 506: * * * the sums which petitioners were to receive did not depend in any way on what Lane could earn from the removal or from its use of the material as fill dirt. Such removed material belonged to Lane alone; and petitioners looked for recovery of their capital solely to their contractual rights against Lane. Thus, in our opinion, petitioners did not retain any economic interest in the material involved. In the instant case, the timber sold to J. L. Ledgett was at a fixed price ($30,000), there was no contingency which would vary that price or Ledgett's obligation to pay it, and petitioner *126 was not to be credited with any part of the timber removed or share in any income or profit Ledgett might derive from the removal and sale of the timber. The contract as drawn provided for the $20,000 deferred payments with interest to petitioner as the timber was developed and removed from the tract without reference to its sale. Petitioner later, to accommodate Ledgett, agreed to accept payments as the timber was sold. This later agreement did not alter the fact that petitioner was not looking to the sale of the timber for his payments. As we interpret the contract the entire price of $30,000 was due to petitioner, regardless of whether Ledgett removed any timber although petitioner in effect retained a lien on the timber since he could, upon default of the purchaser, elect to cancel the contract which would in substance be equivalent to repossession of the timber sold, at least to the extent that it had not been removed from the property. Such a provision is for security of the deferred payments and is not equivalent to a retention of an economic interest. The petitioner sold all the merchantable timber on the described tract to Ledgett for the stated price of $30,000. Regardless *127 of the amount of timber cut and removed by Ledgett, petitioner would receive $30,000 for the timber sold. The provision that $20,000 of the purchase price was deferred until Ledgett began to cut the timber and sell it was for the purpose of fixing the time when the payment was due and not for making the price or amount to be received by petitioner dependent upon the severance of the timber. Since petitioner was not dependent upon the severance and sale of the timber for a return of his investment, he did not retain an economic interest in the timber disposed of to Ledgett. With respect to the timber cut by the Monroe Lumber Company on the Kendall tract, it is respondent's contention that petitioner had not held the timber for more than 6 months prior to the disposal thereof to the Monroe Lumber Company. Under section 117(k)(2) of the Internal Revenue Code of 1939 the date of disposal of timber is the date the contract granting the cutting right is entered into. Springfield Plywood Corporation, 15 T.C. 697 (1950). Petitioner's argument as to his holding period of the Kendall property is based upon the provisions of section 631(b) of the 1954 Code providing that the date *128 of disposal of the timber shall be deemed to be the date the timber is cut. There is no similar provision in section 117(k)(2) of the Internal Revenue Code of 1939 which section is applicable to the taxable years here involved. The contract of February 10, 1950, specifically stated that "it is understood that this contract shall be binding upon the seller to sell and the buyer to buy the timber on the Kendall tract if, as, and when said timber is acquired by the seller." At some undisclosed date between February 10, 1950, and September 30, 1951, Monroe Lumber Company acquired the Kendall timber and deeded it to petitioner pursuant to a supplemental agreement that recited that Monroe Lumber Company had acquired the timber for the use and benefit of petitioner and further recited that all the timber on the Kendall property should be included in and considered a part of the timber sold by the contract of February 10, 1950. If the contract of February 10, 1950, is considered a disposal by petitioner of the Kendall timber, it is obvious that petitioner had not held the timber for 6 months. If we accept petitioner's contention that he acquired the Kendall timber when Monroe Lumber Company *129 acquired it for his use and benefit and consider the disposal of the timber to be on September 13, 1951, the date of the supplemental agreement, there is no showing that the timber had been held by petitioner for over 6 months at the date of its disposal since the record fails to disclose on what date between February 10, 1950, and September 13, 1951, Monroe Lumber Company acquired this timber for the use and benefit of petitioner. Petitioner also contends that since he received the Kendall timber in an exchange of like properties held for investment, the holding period of the Kendall tract timber becomes that of the property for which it was exchanged. Our holding that the timber transferred to the Monroe Lumber Company was held by petitioner primarily for sale to customers in the ordinary course of petitioner's trade or business disposes of this contention. We sustain respondent in his determination that the gain from the sale of the Kendall timber is ordinary income to petitioner. Petitioner in his brief argues that respondent's determination of the depletion applicable to the Kendall timber is in error. Petitioner offered no evidence in this regard, and, we, therefore, sustain *130 respondent's determination for failure of petitioner to overcome its presumption of correctness. Respondent's contention with respect to the amounts received by petitioner as socalled production royalties from Yaquina Bay Mills, Inc., and Cascadia Lumber Company is that petitioner has failed to prove that these production royalties were paid to petitioner by Cascadia Lumber Company or Yaquina Bay Mills under the agreements between petitioner and those companies providing for payments with respect to lumber processed in their mills and that petitioner has failed to established that he had owned the timber from which the lumber was processed for a period of over 6 months. There is attached to the agreement between petitioner and Yaquina Bay Mills, Inc., a list of properties covered by the agreement. However, the record is devoid of any evidence showing how long petitioner had held each of these properties or that the logs from which the lumber that was manufactured in the plants of Yaquina Bay Mills, Inc., and Cascadia Lumber Company came from any of these properties, or if any, from which. There is also no evidence to show petitioner's relationship with the contract or captive mills *131 that produce many of the logs. For all the record shows the logs may have been the property of someone other than petitioner when they were delivered to the mills. Petitioner has failed to establish that the so-called production royalties are entitled to capital gains treatment under the provisions of section 117(k)(2) of the Internal Revenue Code of 1939. Issue 4. Deferred Payment Sales Respondent determined in his notice of deficiency that the sales by petitioner to J. L. Ledgett and Dollar & Patterson, Inc., were deferred payment sales and not installment sales, and, therefore, in each instance included the total amount of the agreed sales price in petitioner's income in the year the sale was consummated, 1952 in the case of J. L. Ledgett and 1953 in the case of Dollar & Patterson, Inc.
It is apparent from the income tax returns filed by petitioners for 1952 and 1953 that they were filed on the cash receipts and disbursements basis. It is also clear that petitioner made no election to report income from either of these sales on the installment basis nor is petitioner contending that he is entitled to report on the installment basis. Petitioner's contention is that being a *132 cashbasis taxpayer he is not required to report any amount of the sales price except that received by him in cash or its equivalent. Petitioner contends that he did not receive cash in excess of the amounts reported by him from the sale to Ledgett in 1952 or from the sale to Dollar & Patterson, Inc. in 1953 and that he received nothing in addition which could be considered the equivalent of cash. While there is no direct evidence that petitioner did not receive notes or some evidence of indebtedness other than the contracts if they could be so considered from the purchasers, we think the inference is clear in each case from the contract involved that he did not. Respondent makes no argument that petitioner may have received notes or other similar evidence of indebtedness but argues that the contracts themselves were property in addition to cash received by petitioner in the years in which they were entered into which had a fair value of the remaining amounts to be paid thereon. A contractual right to receive deferred payments is not the equivalent of cash, but is more in the nature of an account receivable which is includible in income of an accrual-basis taxpayer but not includible *133 by a cash-basis taxpayer until paid. Estate of Coid Hurlburt, 25 T.C. 1286 (1956); Nina J. Ennis, 17 T.C. 465 (1951), appeal dismissed (C.A. 6, 1952). Cf. Estate of Abraham Goldstein, 33 T.C. 1032 (1960). We agree with petitioners that the amounts received under the Ledgett and Dollar & Patterson contracts were properly reportable for income tax in the years received but sustain respondent in his determination that the gain on these sales was ordinary income in the year received for the reasons heretofore stated. Issue 5. Receipts from Use of Road Under petitioner's contract with the Monroe Lumber Company that company was granted the right to cut and remove timber from a tract of land owned by petitioner, the timber to be cut and removed within a stated period, at the end of which the land and improvements thereon belonged exclusively to petitioner. At the time this timber contract was entered into with the Monroe Lumber Company, there was a road on this land which had been placed there by a previous logger. The contract gave to the buyer the usual right, privilege, and easement to enter upon the land during the time the contract was in *134 force, and the right at its own expense to construct and build whatever roads might be necessary, using any gravel or rock which might be upon the premises, and further provided, "the buyer agrees to pay the seller, upon demand, the sum of $4,000 as compensation for roads established by the seller and road work performed by the seller, the buyer to have the unrestricted use of such roads during the life of this contract." Petitioner argues that the provisions of this contract, in effect, amounted to the granting to the buyer of an easement to use the road already constructed on the property. He states that an easement under Oregon law constitutes an interest in land, and that the consideration received for the granting of an easement with respect to land constitutes the proceeds from the sale of an interest in real property, which should be applied as a reduction of the cost or other basis of the property subject to the easement with only any excess over basis constituting recognized gain. A fair interpretation of the contract between petitioner and Monroe Lumber Company is that petitioner granted to Monroe Lumber Company an easement to use the road already established on the property *135 for the life of the contract, that is, the 10 years which Monroe Lumber Company was allowed for the cutting of timber. Thus, if we accept petitioner's argument that an easement is an interest in land and the receipts from the granting of an indefinite easement would be from the sale of an interest in land, it does not follow that receipts from the granting of an easement for a period of years would constitute receipts from the sale of an interest in land as distinguished from receipts from the granting of a lease or license with respect to the land. A lease is the granting of rights with respect to property to another for a period of years. The amounts received for the granting of such rights is rent which is taxable when received by either a cash or an accrual basis taxpayer. Hyde Park Realty v. Commissioner, 211 F. 2d 462 (C.A. 2, 1954), affirming 20 T.C. 43 (1953). Issue 6. Increases in Petitioners' Income over Amounts Shown in the Notice of Deficiency as Affirmatively Alleged by Respondent a. Sale of Yaquina Bay Mills, Inc., Stock Petitioner in 1951 sold 1,350 shares of stock of Yaquina Bay Mills, Inc., to George E. Miller Lumber Co. The total *136 basis of this stock to petitioner was $143,500, [8] and the total amount received by petitioner from the sale of such stock was $225,000. These facts are clear from the record and neither party contends to the contrary. The difference between the parties relates to the portion of the overall net gain to petitioner of $81,500 that is short-term capital gain and the portion that is long-term capital gain. Petitioners on their income tax returns reported the sale of the 1,350 shares of stock of Yaquina Bay Mills, Inc., as resulting in long-term capital gain of $80,722.25, showing as the date of acquisition of all of the shares June 1950, and the date sold March 1951, and a total cost basis of $144,277.75. Petitioners now agree that the cost basis used by them was erroneous and contend that the net gain of $81,500 on the sale of this stock is composed of long-term capital gain in the amount of $91,500 on the sale of 665 shares and short-term capital loss in the amount of $10,000 on the sale of the remaining 675 shares. Respondent contends that petitioner realized long-term capital gain *137 in the amount of $45,922.75 on the sale of 450 shares, short-term capital gain in the amount of $17,768.25 from the sale of the 225 shares represented by Certificate No. 5 to which petitioner subscribed at the date of the incorporation of Yaquina Bay Mills, Inc., and short-term capital gain in the amount of $37,809 from the sale of 675 shares. The differences between the parties are basically two. First, petitioner contends that the period of holding on the 225 shares of stock represented by Certificate No. 5 to which he subscribed in June of 1950 and which was issued in his name on July 19, 1950, is more than 6 months and thus the gain from the sale of this stock is long-term capital gain. Second, petitioner contends that the selling price of the stock should be allocated in accordance with an agreement entered into between petitioner and the Millers on July 5, 1951. Respondent argues that the provisions of section 57.121(4) of Oregon Revised Statutes that no certificate shall be issued for any share of stock in a corporation until such share is fully paid prohibits petitioner from having acquired the 225 shares of stock represented by Certificate No. 5 until June 13, 1951, when *138 the subscription price was paid. In support of his position respondent relies on Ethlyn L. Armstrong, 6 T.C. 1166 (1946), affirmed per curiam 162 F. 2d 199 (C.A. 3, 1947), and Sommers v. Commissioner, 63 F. 2d 551 (C.A. 10, 1933), affirming 22 B.T.A. 1241 (1931). Ethlyn L. Armstrong, supra, did not involve a stock subscription, but an executory contract between individuals relating to the purchase of stock. Sommers v. Commissioner, supra, involved a subscription to stock of a Colorado corporation. In that case it was held that since under Colorado law the subscription agreement was not binding on the corporation until the certificate was issued, the stock was held by the taxpayer therein only from the date the certificate was issued. Here, we must look to Oregon law to determine whether petitioner owned the stock in Yaquina Bay Mills, Inc., to which he subscribed in 1950 represented by Certificate No. 5 prior to the date the subscription price of $22,500 was paid. Petitioner states that the effective date of section 57.121(4) of Oregon Revised Statutes is January 1, 1954, the section having been enacted by *139 the 1953 Legislature of Oregon, and thus it has no effect in the determination of the question here before us which concerns the years 1950 and 1951 and that prior to 1953 there was no comparable provision in the Oregon law. Petitioner is correct in this statement. Where the local law or the charter of the corporation does not provide to the contrary, a subscriber to stock in a corporation becomes a stockholder upon acceptance of his subscription by the corporation. Cf. C. M. Hall Lamp Co. v. United States, 201 F. 2d 465 (C.A. 6, 1953). Under Oregon law an accepted subscription is binding on both the subscriber and the corporation. Atwell v. Schmitt, 225 Pac. 325, 328 (Ore. Sup. Ct. 1924). Cf. May v. Roberts, 286 Pac. 546 (Ore. Sup. Ct. 1930). Petitioner properly reported the sale of the 225 shares of Yaquina Bay Mills, Inc., stock represented by Certificate No. 5 as resulting in long-term capital gain. With respect to the remaining 675 shares to which both petitioner and respondent allocate a cost basis of $81,000, petitioner does not contend that it had held the stock for more than 6 months. Petitioner's contention with respect to these *140 shares is that the selling price thereof was $71,000 and that the sale of these shares resulted in a long-term capital loss of $10,000. Petitioner relies for this allocation upon the document entered into "this day of June 1951" between petitioner and the George E. Miller Lumber Company, reciting that petitioner has accepted the offer made by the George E. Miller Lumber Company to purchase 975 shares of the capital stock of Yaquina Bay Mills, Inc., and reciting the method of payment therefor. The offer referred to recites that George E. Miller Lumber Company offers to purchase 300 shares of the capital stock of Yaquina Bay Mills, Inc., represented by Certificate No. 5 for 225 shares and Certificate No. 13 for 75 shares for the sum of $101,500 with the method of payment therefor set forth and also offers to purchase 675 shares of the Yaquina Bay Mills, Inc., stock, the certificate for which is now escrowed in the First National Bank of Portland, Oregon for a total sum of $71,000, listing the method of payment for these shares. The testimony showed that the George E. Miller Lumber Company wished to buy the controlling interest in Yaquina Bay Mills, Inc., for a price of $225,000 and that *141 it was immaterial to the purchaser how the price was prorated between the various certificates. Furthermore, the purchaser believed the most valuable asset of Yaquina Bay Mills, Inc., to be its timber contract with petitioner, and, therefore, was anxious to meet petitioner's terms as nearly as possible. Petitioners in their brief state, "Petitioners freely admit that the allocation of the selling price as set forth in the agreement of June 1951 * * * was made at the insistence of petitioners to minimize their tax liability for that year." The petitioner, however, contends that the transaction was arm's-length and that there is no basis for respondent's ignoring it. Respondent stresses the fact that the agreement was made in June of 1951 which was subsequent to the sale of the stock in May 1951, and petitioner argues that since the contracts between petitioner and Yaquina Bay Mills, Inc., and petitioner and Cascadia Lumber Company were originally drafted for execution "the day of June 1951" but were not actually executed until July 5, 1951, it would appear to be more than a coincidence that the stock, though purchased by the George E. Miller Lumber Company in May of 1951, was not *142 actually issued at the direction of the partners of George E. Miller Lumber Company until July 5, 1951. The sale of the stock to George E. Miller Lumber Company was made in May 1951. A contract subsequently entered into solely for its effect on petitioner's tax liability is totally devoid of any business purpose. Such a contract is so lacking in substance that to recognize it for determining the price paid for the various shares of stock would be "to exalt artifice above reality." Gregory v. Helvering, 293 U.S. 465 (1935). Petitioner in May 1951 sold 975 shares of stock of Yaquina Bay Mills, Inc., for $172,500 or an average price per share of $176.92. Three hundred of these shares had been held by petitioner for more than 6 months and the gain thereon was properly reported as longterm capital gain. Six hundred seventy-five of these shares with a cost basis of $81,000 had been held by petitioner for less than 6 months and the gain thereon in the amount of $37,809 was short-term capital gain. b. Deductions Taken for Charitable Contribution As we have found, petitioner agreed to pay $5,000 to the Sacred Heart Church if he would be given preferential treatment in buying *143 certain timber and timberlands. The evidence shows that not only was he given preferential treatment in being selected as the purchaser of this timber and timberland, but the price which would otherwise have been charged for the timber and timberland was reduced by approximately $5,000 because of the payment denominated as a contribution petitioner had agreed to make, and did make, to the Sacred Heart Church simultaneously with the payment of the recited purchase price for the timber and timberland. Where an amount is, in fact, paid for some personal benefit, it is not a deductible charitable contribution for the purpose of computing income tax. Estate of O. J. Wardwell, 35 T.C. 433 (1960), on appeal (C.A. 8, Mar. 4, 1961). Petitioner's disbursement of $5,000 to the Sacred Heart Church in 1953 is not deductible in computing his income tax. c. Profits from Joint Venture between Petitioner and Walter S. Hilberg The evidence with respect to the transactions between petitioner and Walter S. Hilberg is far from satisfactory. However, insofar as the evidence shows, both parties considered that when Hilberg sold the property, the income from the sale was his because he had, *144 pursuant to petitioner's request, transferred a property of comparable value entirely to petitioner, both properties previously having been owned jointly by the two. The respondent affirmatively alleged that increases should be made in petitioners' income from the joint venture with Walter S. Hilberg, and, therefore, the burden of proof that such income was derived by petitioner is upon respondent. Most of the properties involved in these transactions were timberlands and not merely the timber. These properties were in many instances held by petitioner jointly with Hilberg. The evidence fails to show that the properties involved in petitioner's transactions with Hilberg were not held by him for investment and fails to show that these transactions did not involve even exchanges of like properties so that there was no resulting income to be reported by petitioners from the transactions. Respondent has failed to establish that petitioner's income should be increased because of profit realized from sales of property by the joint venture between petitioner and Walter S. Hilberg. d. Sales of Timber, Logs, and Lumber to Yaquina Bay Mills, Inc. Here, again, respondent having affirmatively *145 alleged that petitioner's income should be increased by the amounts received by petitioner from timber, log, and lumber sales to Yaquina Bay Mills, Inc., which he did not report on his income tax returns, has the burden of proof. The evidence shows the credits to petitioner's account with Yaquina Bay Mills, Inc., in the amounts as claimed by respondent and also shows that the charges against petitioner's account in each of the years except the final year 1954 not here involved were in lesser amounts than the credits to petitioner's account. Petitioner argues that there were other cost items to be offset against the amounts due to petitioner by Yaquina Bay Mills, Inc., so that the portion of the credits to petitioner's account which would represent income was less than respondent contends. We need not here pass on this factual issue since respondent has failed to show that the amounts credited to petitioner's account by Yaquina Bay Mills, Inc., were subject to his free demand at any time. Petitioner's income was reported on the cash receipts and disbursements basis. Normally, on the cash basis, a taxpayer reports income when payment of accounts due him is received. Respondent's argument *146 here is in effect that petitioner constructively received the entire amounts credited to his account by Yaquina Bay Mills, Inc. The doctrine of constructive receipt is not to be lightly applied but to be invoked only where the facts clearly justify the conclusion that the amount alleged to have been constructively received is subject to the taxpayer's unfettered withdrawal and free demand although not actually reduced to possession. Robert J. Dial, 24 T.C. 117, 123-124 (1955). Here, the facts show that Yaquina Bay Mills, Inc., was short of cash and at times petitioner would ask for a payment which Yaquina Bay Mills, Inc., would persuade him to permit it to delay because of its cash position. Respondent has failed to establish that petitioner received any income from sales of logs, timber, and lumber to Yaquina Bay Mills, Inc., which he did not report in his income tax returns for any of the years here involved. e. Timber Sales to Canyon Logging Company, Geil & Van Handel Lumber Company, and George E. Miller Lumber Company The $7,000 of alleged unreported income from the sale of timber to the George E. Miller Lumber Company resulted from a transaction whereby petitioner *147 agreed to sell timber to the George E. Miller Lumber Company in exchange for certain timberlands which petitioner was then attempting to purchase from Earl C. Williams. George E. Miller Lumber Company issued its check for $7,000 to Earl C. Williams, and Williams deeded timberlands to petitioner. In view of our holders with respect to other claimed exchanges of like properties by petitioner, we sustain respondent in the addition of $7,000 to petitioner's income on the ground that the timber conveyed by petitioner was not held by him for use in his trade or business or for investment, and, therefore, the transaction does not come within the provisions of section 112(b)(1) of the Internal Revenue Code of 1939. The conveyance by petitioner to Pritzlaff and Wilson for which they issued their check for $7,000 at petitioner's direction to the Reliance Title and Abstract Co., and the conveyance to Geil & Van Handel Lumber Co. for which they issued their check for $2,000 to the Reliance Title and Abstract Co. were sales of timber held by petitioner for sale to customers in the ordinary course of his trade or business and not for productive use in his business or for investment. This transaction *148 does not fall within the provisions of section 112(b)(1) of the Internal Revenue Code of 1939, and we, therefore, sustain respondent in his addition of $9,000 to petitioner's income from the sale of timber to Pritzlaff and Wilson and to Geil & Van Handel Lumber Company. Issue 7. Fraud Respondent's major arguments in substantiation of his allegation of fraud deal with the alleged unreported income from sales of timber, the alleged contribution to the Sacred Heart Church, and the agreement with respect to the allocation of the sales price of the Yaquina Bay Mills, Inc., stock. Respondent points to the circumstances under which Pritzlaff and Wilson and Geil & Van Handel Lumber Company and the George E. Miller Lumber Company were persuaded to sign documents and to issue their checks to third parties instead of to petitioner where petitioner was simulataneously negotiating for other properties, and to the circumstances, the facts with respect to which we have set out in some detail in our findings, of the claimed exchanges by petitioner in connection with timber sales to the Springfield Plywood Corporation and Monroe Lumber Company. Respondent also argues that the evidence shows that *149 petitioner altered documents in connection with the purchase of the Maesfrancx timber and timberlands and the sale of the Fox Valley timber. While we have held that none of the transactions which petitioner considered to constitute exchanges of like properties qualified, as a matter of law, under section 112 (b)(1) of the Internal Revenue Code of 1939, the evidence falls far short of any showing that petitioner's treating these transactions as exchanges was with fraudulent intent to evade tax. Where investment property has been exchanged for property to be held for investment, the fact that one party acquired the property for the purpose of effecting the exchange has been held not to make section 112(b)(1) of the Internal Revenue Code of 1939 inapplicable to the exchange. W. D. Haden Company v. Commissioner, 165 F. 2d 588 (C.A. 5, 1948), affirming on this issue and reversing on another issue a Memorandum Opinion of this Court. While the transactions here, which were not always simultaneous, might not be considered to qualify for exchanges even though the property had been like investment property, such a transaction would be of doubtful enough nature that it could *150 well be entered into without any fraudulent intent to evade income tax. An exchange of like properties, which otherwise meets the requirement of section 112(b)(1) of the Internal Revenue Code of 1939 comes within that section even though the exchange is effected by the taxpayer with the intent to arrange the transaction in such a manner as to avoid the immediate recognition of gain. Mercantile Trust Company of Baltimore, et al., Executors, 32 B.T.A. 82, 87 (1935). The respondent also relies upon petitioner's claimed contribution of $5,000 to the Sacred Heart Church of Newport, Oregon and the alterations in the documents involved in the acquisition of the Maesfrancx properties as being indicative of fraud. While we have held that respondent is correct in his position that the amount of claimed charitable contribution is not properly deductible, we do not think that the claimed deduction under the circumstances which we have recited, is clear and convincing evidence of fraud. The evidence also fails to show any fraud in the alteration of the contracts for the purchase of the Maesfrancx property. The evidence fails to show that the documents were not changed prior to the *151 time they were signed by Rodakowski. Also, this transaction was negotiated by petitioner's agent and not by petitioner. Other items are relied upon by respondent as indicative of fraud, such as petitioner's joint venture with Hilberg and the unreported income from timber, log, and lumber sales to Yaquina Bay Mills, Inc. We have held that respondent has not shown the understatement of income by petitioner from these transactions. While we have held partially in favor of respondent in his affirmative allegations with respect to the sale of the Yaquina Bay Mills, Inc., stock, the transaction is far from convincing evidence of fraud. Considering all the evidence, we hold that respondent has failed to establish that any part of the deficiencies for any of the years 1950, 1951, 1952, and 1953 was due to fraud with intent to evade tax. Decision will be entered under Rule 50. Footnotes
1. During the taxable years here involved petitioner made the following sales of land on which he reported the gains as long-term capital gains: Location of Property
Property sold
County
State
1950
1951
1952
1953
Blair & Darts
Clark
Washington
$800.00
Addition
Waggoner tract
Lincoln
Oregon
500.00
Sec. 31, T2S, R14W
Lane
Oregon
$29,832.00
Sec. Acres
Linn
Oregon
300.00
Sec. 27, T13S, R10W
Lincoln
Oregon
$217.58
Lot - Kalama
Cowlitz
Washington
500.00
Lot - Raymond
Pacific
Washington
450.00
Lot - Newport
Lincoln
Oregon
370.00 Respondent in his notice of deficiency made no change in petitioner's reporting of the gain from these sales.↩
*. Less selling costs of $2,000.00.↩
2. Petitioners on their income tax return for 1950 reported long-term capital gain from timber sales to Monroe Lumber Company in the amount of $39,328.79 and no change was made with respect to this item by respondent in his notice of deficiency.↩
3. The stipulation of facts states that Cascadia Lumber Company was a partnership owned and operated by George E. Miller in the taxable years here involved. From the documentary evidence in the record it appears that this is an error and that Cascadia Lumber Company is an Oregon corporation, the stock of which was owned by George E. Miller Lumber Co. or George E. Miller in the taxable years here involved.↩
*. In his computation of the increased deficiencies claimed in his amended answer respondent used the amount of $19,231.61 as the increase in petitioner's 1951 income.↩
4. SEC. 117. CAPITAL GAINS AND LOSSES. (a) Definitions. - As used in this chapter - (1) Capital assets. - The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (A) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; (B) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 23(1), or real property used in his trade or business; (C) a copyright; a literary, musical, or artistic composition; or similar property; held by - (i) a taxpayer whose personal efforts created such property, or (ii) a taxpayer in whose hands the basis of such property is determined, for the purpose of determining gain from a sale or exchange, in whole or in part by reference to the basis of such property in the hands of the person whose personal efforts created such property; or (D) an obligation of the United States or any of its possessions, or of a State or Territory, or any political subdivision thereof, or of the District of Columbia, issued on or after March 1, 1941, on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue.↩
5. Sec. 112(b)(1)↩ Property held for productive use or investment. - No gain or loss shall be recognized if property held for productive use in trade or business or for investment (not including stock in trade or other property held primarily for sale, nor stocks, bonds, notes, choses in action, certificates of trust or beneficial interest, or other securities or evidences of indebtedness or interest) is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment.
6. Sec. 117(k) Gain or Loss in the Case of Timber or Coal. - * * *
(2) In the case of the disposal of timber or coal (including lignite), held for more than 6 months prior to such disposal, by the owner thereof under any form or type of contract by virtue of which the owner retains an economic interest in such timber or coal, the difference between the amount received for such timber or coal and the adjusted depletion basis thereof shall be considered as though it were a gain or loss, as the case may be, upon the sale of such timber or coal. * * * In determining the gross income, the adjusted gross income, or the net income of the lessee, the deductions allowable with respect to rents and royalties shall be determined without regard to the provisions of this paragraph. * * * ↩
7. Petitioner also contends that if his sales of timber are sales of capital assets, the production royalties should also be considered as receipts from sales of capital assets. Since we have held that the timber sold by petitioner was held primarily for sale to customers in the ordinary course of his trade or business, no independent discussion of this contention of petitioner is made since it is considered disposed of by our holding with respect to the sales generally of timber by petitioner.↩
8. Petitioner and respondent both conceded on brief that this is the total basis of the stock.↩